## Case No. 2,591.

### In re CHANDLER.

[1 Lowell, 478;[1] 4 N. B. R. 213 (Quarto, 66.]

District Court, D. Massachusetts. Oct., 1870.

BANKRUPTCY—"MANUFACTURER"—ACT OF BANKRUPTCY—SUSPENSION OF PAYMENT OF COMMERCIAL PAPER.

1. One who prepares for market and sells lumber, the growth of his own land, is a manufacturer within the meaning of the bankrupt act as amended by the act of July 14, 1870 [16 Stat. 276].

2. The commercial paper mentioned in section 39 of the bankrupt act [14 Stat. 536] includes not only the notes, bills, &c., given by a merchant or other person mentioned in the section in the ordinary course of his business, but all negotiable paper. The terms are descriptive of the kind of paper, and not of the mode in which it was in fact issued or used in the given case.

[Cited in Re Stevens, Case No. 13,393; Re Clemens, Id. 2,877.]

3. The failure of an accommodation indorser to pay the note for fourteen days after his liability has been duly fixed, is an act of bankruptcy, if there is no defence to the note in the hands of its holder, and if the indorser is a manufacturer.

[Cited in Re Carter, Case No. 2,470; Re Clemens, Id. 2,878; Whiting v. Wellington, 10 Fed. 815.]

Petition in invitum heard by the court on an agreed statement of facts with some supplementary evidence admitted by consent. The defendant was a member of the bar, but had of late retired from active practice and carried on, among other things, a steam saw-mill, in which he prepared, by his agents, boards and shingles from lumber grown on his own land, and sold them in the market. He was liable on a large number of negotiable notes which he had indorsed for the accommodation of H. Woodman, and Woodman was liable on a less number indorsed for the accommodation of the defendant. The petitioner held one of the former notes which he bought for value before its maturity, and which had been dishonored and duly protested more than fourteen days before the petition was filed.

H. D. Hyde, for petitioner.

The defendant is a trader by reason of his lumber business, and of his practice of raising money by exchange of notes. If not a trader he is a manufacturer. The note held by the petitioner is commercial paper.

G. S. Hillard, for defendant.

There is no evidence of trading. The English cases, which are very numerous and perhaps not entirely harmonious, yet all agree that one who merely sells the produce of his own land is not a trader. The note set out in the petition is not commercial paper within the true intent of section 39. In re Lowenstein [Case No. 8,574]; In re McDermott Patent Bolt Manuf'g Co. [Id. 8,750],—which decide that the paper must not only be given by a merchant, but in the course of his business.

LOWELL, J. I am disposed to agree with the argument of the defendant's counsel that one cannot be a trader unless he buys as well as sells, but is not Mr. Chandler a manufacturer? [But this rather strengthens the second position of the petitioner, that such a person may be a manufacturer, because it shows a reason for the recent amendment by which manufacturers were added to the traders, etc., in the statute.][2] One who works up lumber on a considerable scale is popularly called a manufacturer of that article, and such lumber is spoken of as manufactured in our tariff acts and treasury regulations, and in the lately repealed [reciprocity][2] treaty regulating commerce with Canada. If so, the fact that the manufacturer uses only lumber which he grows himself does not appear to be material. It is not like the case, put in argument, of a farmer making cider or cheese, for two reasons: These products when made by the farmer exclusively from his own farm, are not usually made on so large a scale as to be called a manufacture, as the word is now commonly used, and the making is one merely incidental to the cultivation of his land, like curing his hay, &c. But in the case of the lumber business, the land may be almost said to be incident to the lumber, which usually forms its chief value, and the manufacture itself is the main source of prof-

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [From 4 N. B. R. 213 (Quarto, 66.]

it, independently of any cultivation or other use of the land. In this respect the business of the defendant seems more analogous to that of a miner, who is made subject to the act, and as to whom it would hardly be contended that the ownership of the land was material.

If, then, the defendant is a manufacturer, has he suspended payment of his commercial paper? Upon this point I am referred to two cases [in the southern district of New York,—In re Lowenstein [Case No. 8,574]; In re McDermott Patent Bolt Manuf'g Co. [Id. 8,750],—in which Judge Blatchford ruled][2] that the paper mentioned in the statute is such as is given by a merchant or trader in the direct course of his business, and not for a mere loan of money, though the money may have been used in his business, and still less for any dealing outside of his trade. Some cases that were not cited are of a different tenor: Heinsheimer v. Shea [Case No. 6,328]; In re Nickodemus [Id. 10,254]; In re Hollis [Id. 6,621]. In these cases the term commercial paper is said to be descriptive of a certain sort of contract [or security].[2] Thus in Nickodemus' Case, Judge Withey expresses the opinion that it refers to bills of exchange, promissory notes, and negotiable bank checks, paper governed by the rules which have their origin and are established upon the custom of merchants. "Such paper," he says, "is usually denominated commercial paper, and we must presume congress used the term in its common acceptation, rather than in a more restricted sense." Similar opinions are given in the other cases cited. Judge Withey finds support for this construction in the fact that bankers, who are not engaged in commerce, strictly so called, are within the act, and this view is much strengthened by the amendment, which adds brokers, manufacturers, and miners to the persons the dishonor of whose obligations is an act of bankruptcy. It is of the utmost consequence to preserve the uniformity which the constitution and the law intend should be established in this important branch of commercial jurisprudence, and this uniformity will in so far fail to be attained as the statute is differently construed by different tribunals. In this case, however, since I find the diversity already existing, I must choose between the opposing views, and after the most careful deliberation I consider the more enlarged construction to be the true one. Bills of exchange have their origin and derive their peculiar properties from the custom of merchants. Thomas Malynes, merchant, writing in 1629, before promissory notes had come into use in England, thus quaintly expressed himself: "The nature of a bill of exchange is so noble and excelling all other dealings between merchants that the proceedings therein are extraordinary and singular, and not subject to any prescription by law or otherwise, but merely subsisting of

a reverend custom used and solemnized concerning the same." Lex Mercatoria, pt. 3, c. 5. And he explains at great length how different the rights and duties of the parties to such a contract are from those arising under any contract known to the common law of England. It is familiar learning that the mode of declaring on a bill of exchange was, that it had become due and payable to the plaintiff according to the custom of merchants, and this was a necessary allegation. When notes of hand became common, similar declarations were framed upon them, but the courts refused to admit the validity of a custom to pay a note to the indorsee without an express promise to that effect, because, they said, it would tend to defraud the promisor, who might have already paid the note to a former holder, and they denied to the holder the right to sue according to the custom of merchants. Clerke v. Martin, 2 Ld. Raym. 757. Immediately after this last decision, the statute 2 & 3 Anne, c. 9, afterwards made perpetual, was passed, which recited the fact of such a decision, and proceeded for the encouragement of trade to place negotiable notes, for the payment of money, upon the same footing as inland bills of exchange, and declared that they should be assignable to and suable by the holder according to the custom of merchants. This phrase is used repeatedly throughout the act. This statute has been copied in many of our states, and adopted in others as part of their common law. Story, Prom. Notes, § 6, and note 2; 3 Kent, Comm. 72, and note a.

Such negotiable paper therefore stands by usage and by statute upon the custom of merchants, and is controlled and regulated by such custom. And these regulations are always treated as part of the law merchant. Now in saying that any person belonging to one of certain designated classes should be deemed a bankrupt if he failed to pay his commercial paper, it seems to me that congress simply referred to a well known and very conclusive test of insolvency. If a trader allows his paper to go to protest, he is said to have failed or suspended. The expressions are used as equivalent. It is like the closing of the counting-room and denying one's self to creditors of the old English bankrupt law [and it will be observed that while congress has not thought fit to say that every insolvent person may be made bankrupt against his will, yet any one who has shown by certain conclusive acts or neglects like avoiding process, buying in person, and suffering paper to remain dishonored, that he cannot hope to pay his debts, may be proceeded against].[2] In this point of view, it makes no difference in reason that the particular note which is dishonored was not given in the regular course of the business of the promisor; the obligation to pay and the inference from neglect are equally stringent. In the bankrupt court we have

---

[2] [From 4 N. B. R. 213 (Quarto, 66).]                    [2] [From 4 N. B. R. 213 (Quarto, 66).]

occasion to know that accommodation notes are often so made as to simulate notes given for merchandise, because the latter command a higher price in the market, but the rights of the bonâ fide holder are the same in both cases. It seems more just and reasonable to conclude that congress intended to designate a certain kind of promise, well known to and governed by the law merchant, and not to give a peculiar sanctity to such as happens between the first parties to it to have originated in a particular way, thus instituting an inquiry which appears wholly immaterial to the purpose in hand, and not admissible in any other form of action, and unjust to the holder of the paper. It is as if the law had enumerated the various kinds of promise, instead of designating them by a comprehensive term, which Judge Withey says is commonly used to designate such paper. While, therefore, I agree with the defendant that commercial means mercantile, and that merchandise means pertaining to trade, yet I can by no means adopt the conclusion that the particular bill or note must be in any way connected with commerce or trade, but rather that it must be of that class which commerce introduced and still deals in. If congress had said that when a merchant, &c., had stopped payment, he should be deemed bankrupt, unnecessary litigation might have arisen out of the non-payment of open accounts which are much used of late years, between wholesale dealers and their customers in trade, and they therefore fixed upon that kind of promise which is payable on a day certain, and the dishonor of which is a sure test of insolvency. The defendant testified to his understanding that "commercial paper" was used in State street in contradistinction to "accommodation paper." Judge Withey, on the other hand, in the passage already twice cited, says the phrase is commonly used to mean such paper as comes within the purview of the law merchant. No doubt a distinction is made in the market between these classes of notes or bills, but I do not profess to be acquainted with [or to have been shown] [2] any usage so general throughout the country as to enable me to construe the phrase used in the statute as a term of art intended to distinguish between them, or as having any other technical meaning. In the books on trade the term used is "real bills," to designate those given in a genuine transaction between dealers, and I have heard the expression "business paper" applied in the same way. But I am not satisfied that the phrase in the statute is intended to have that meaning, or that it in fact has it according to any wide-spread usage. It seems improbable, because such paper is equally sacred in the hands of the bonâ fide holder, and the failure to pay it is as sure a test of insolvency, and an inquiry into

the origin of such contracts is never admissible for any purpose or in any court in a suit by such a holder. If there is any defence which affects the holder, the remedy is ample, because the failure to pay such a note would not be a suspension of payment; but beyond that the inquiry would be unreasonable and embarrassing, and would often present advantages to a defendant whose dealings have been somewhat irregular and unusual, which I do not believe the statute intended to give. Many, perhaps most, of those traders who are obliged to suspend payment, have been injured by speculations beyond the legitimate line of their trade, but their failure is equally certain, and the rights of all classes of their creditors are the same as if they had continued to deal in the course most familiar to them. One of the judges has intimated, though it was not necessary for him to decide, that accommodation paper might perhaps be excluded by the word his of the statute. But upon further reflection I think it would appear to him, as it does to me, that his commercial paper, as applied to one proceeded against in bankruptcy, merely means paper which he is bound to pay, without reference to its origin. If a banker, &c., has indorsed a note, the indorsement is his; and if he has received due notice of dishonor, he is liable to pay the note; and if he has thereafter failed to pay it the failure is his; and this although some one else, who was bound to save him harmless, has failed to do so, and thus has broken two promises, while the indorser has broken but one. The one is sufficient to establish his failure to meet his obligations.

I must therefore hold that the act of bankruptcy alleged in the petition is proved. It is a great satisfaction to me to know that this decision can be reviewed in the circuit court, and I hope the respondent will take the necessary steps to that end. A recent rule of the circuit court points out the time and manner of applying to the general supervisory power of that court.

Petition sustained. Defendant adjudged bankrupt. Warrant not to issue for ten days unless appeal is waived.