## WHITING *v.* WELLINGTON.

*(Circuit Court, D. Massachusetts.   January 31, 1882.)*

1. REAL ACTION FOR POSSESSION OF LAND.

    An action, brought to try the right of possession to a parcel of land under the statute of Massachusetts,(Gen. St. *c.*140, § 3,) by a mortgagee against a mortgagor after condition broken, for possession of the premises, where either party may require that a conditional judgment be entered ascertaining the amount of the debt, and awarding possession to the demandant, unless the tenant shall pay .the amount so ascertained within two months, is a substitute for an entry upon the·land for the purposes of foreclosure, plus a judicial determination of the right of entry.

2. SAME—ASSIGNEE—JURISDICTION.

    The circuit court has jurisdiction in a real action for the possession of land brought by an assignee of the note and mortgage.

3. CORPORATIONS—AUTHORITY OF OFFICERS.

    Where the treasurer of a savings bank, having the authority to do so, executed an assignment of a mortgage in the name of the bank in due form, and indorsed the note to a *bona fide purchaser*, the title passes, notwithstanding he perpetrated a fraud upon the bank, and converted to his own use the purchase money.

4. SAME—ESTOPPEL IN PAIS.

    A corporation is estopped to prove, as against *bona fide* purchasers, either irregularity or fraud upon the part of its officers when acting within their authority.

Real action to recover certain lands in Reading, Massachusetts, tried upon agreed facts. The tenant, Wellington, being seized in fee of the demanded premises mortgaged them in 1874 to the Reading

Savings Bank to secure his note for $1,800, on demand, with interest. The debt has not been paid, and therefore the condition of the mortgage has been broken. In January, 1879, Nathan P. Pratt, the treasurer of the said savings bank, executed an assignment of the mortgage in the name of the bank, and in due form, and indorsed the note to one Kimball, who paid him the full amount of the note, with interest. As part of the same transaction Kimball bought certain other notes and mortgages, amounting to some five or six thousand dollars. Kimball was acting for the Appleton National Bank, and gave Pratt a receipt, signed by him as president of said national bank, in which he agreed to return and reassign the notes and mortgages upon repayment of the amount paid and interest within six months. The assignments were to Kimball personally.

The Appleton bank has taken no action concerning any of those mortgages. Kimball himself paid that bank the full amount of money advanced for them, and afterwards assigned the note and mortgage of Wellington to the plaintiff, for value, March 25, 1879.

March 19, 1879, the Reading Savings Bank failed and stopped payment, and its affairs are now in the hands of receivers appointed by the supreme court of Massachusetts. It was discovered about this time that Pratt had fraudulently disposed of nearly all the assets of the savings bank, and had concealed his fraud by leaving on the files forged duplicates of the mortgages, and other evidences of debt and title so disposed of. This mortgage was a part of those assets, and Pratt converted to his own use the money which Kimball had paid for it. All this was unknown to the trustees of the bank.

Before and at the time of executing the assignment to Kimball, Pratt was the secretary of said savings bank, and the officer who kept and had charge of its records, and the records of its board of trustees, and in order to prove his authority in the premises he delivered to Kimball a copy of a vote of the trustees as follows:

"At a meeting of the trustees of the Reading Savings Bank, held May 3, 1876, upon motion of C. P. Judd, one of the trustees, *voted*, that the treasurer be authorized to discharge, assign, and release all mortgages belonging to the bank. A true copy. Attest: NATHAN P. PRATT, Secretary."

It is agreed, if competent to be proved against the demandant's objection, that although the certificate was a true copy of the record, the vote, as passed, did not contain the word "assign," but the record had been skilfully altered by Pratt, or with his knowledge, at some time before the assignment to Kimball; and the forgery had not

been discovered by the trustees, who had been changed from time to time by death, resignation, etc.

The trustees had a committee of investment, and transactions like that with Kimball were usually passed upon by that committee before action of the trustees or the treasurer. This was a general usage of savings banks, and Kimball was acquainted with the usages of those institutions. Kimball believed the copy to be a true one, and took the assignment upon the strength of it. The committee of investment kept no record.

*J. G. Abbott* and *S. A. B. Abbott,* for demandant.

*B. F. Butler,* for tenant.

LOWELL, C. J. This action is brought to try the right of possession to the described parcel of land in Reading. Under the statutes of Massachusetts (Gen. St. *c.* 140, § 3 *et seq.*) a mortgagee may have this action against the mortgagor, after condition broken, for possession of the premises, and either party may require that a conditional judgment shall be entered ascertaining the amount of the debt and awarding possession to the demandant unless the tenant shall pay the amount so ascertained within two months. There is no order to pay the money, and if it is not paid there can be no execution to recover it, but a writ of possession issues, and the tenant has three years from the execution of this writ within which to redeem the premises. This action is a substitute for an entry upon the land for the purposes of foreclosure, plus a judicial determination of the right of entry. If it were a substitute for a bill in equity to foreclose, it is doubtful whether this court could entertain it, because our equitable jurisdiction is independent of any remedies given by the states in the nature of actions at common law for enforcing equitable rights. This is an action to try the right of possession; and if any part of the statute is not in force here it is merely that which gives the tenant an equitable stay for two months on certain terms. The tenant himself has moved for that stay in this case if the title should be found against him, and cannot well complain if it should be *ultra vires.*

Kimball, as a purchaser in good faith without notice, obtained a title by estoppel against the savings bank by virtue of the certificate of its recording officer that a certain vote was found upon its records. I can take judicial notice that such a certificate is the ordinary proof of authority given and received when land is conveyed by corporations. It is, therefore, within the usual power and duty of a recording officer to make such a paper.

If the case turned upon the record itself, somewhat different and, perhaps, more difficult questions might require to be answered; but it is immaterial whether there was any vote or any record. The records were the private *memoranda* of the bank, to which Kimball had no right to demand access. The estoppel arises from the certificate.

The authorities upon estoppels *in pais* are numerous and increasing. In a recent case in England a statute declared that unless certain things were done no shares of a joint-stock company should be issued excepting for cash, and all which should be issued otherwise should be subject to assessment. Shares were issued as "paid up," and were bought by a *bona fide* purchaser. The company and its liquidator were held estopped to prove that the statute had not been followed. *In re British, etc., Co.* 7 Ch. D. 533; S. C. *nom. Burkinshaw* v. *Nicolls*, 3 App. Cas. 1004. In that case (page 1026) a very able judge says that the doctrine of estoppel *in pais* is a most equitable doctrine, and one without which the law of the country could not be satisfactorily administered:

"When a person makes to another the representation, 'I take upon myself to say such and such things do exist, and you may act upon the basis that they do exist,' and the other man does really act upon that basis, it seems to me it is of the very essence of justice that, between those two parties, their rights should be regulated, not by the real state of the facts, but by that conventional state of facts which the two parties agree to make the basis of their action; and that is, I apprehend, what is meant by estoppel *in pais* or homologation."

This doctrine has been affirmed by the supreme court in a large class of cases where the facts are much more open to public observation than are the votes of a private corporation, in which counties and towns having power to issue bonds upon certain terms and conditions are held estopped to prove, as against *bona fide* purchasers, either irregularity or fraud on the part of their own officers in issuing the bonds, especially if they contain upon their face a certificate that the terms of the law have been complied with. These decisions do not depend upon the negotiable character of the bonds, excepting when there is a question of notice. *Com'rs* v. *Aspinwall*, 21 How. 539; *Moran* v. *Com. of Miami*, 2 Black, 722; *Rogers* v. *Burlington*, 3 Wall. 654; *Grand Chute* v. *Winegar*, 15 Wall. 355; *Com'rs* v. *January*, 94 U. S. 202; *San Antonio* v. *Mehaffy*, 96 U. S. 312; *County of Warren* v. *Marcy*, 97 U. S. 96. So, if a cashier has authority to certify a check, the bank is estopped to say that his certificate is false in fact. *Merchants' Bank* v. *State Bank*, 10 Wall. 604. If a company has issued a certificate of shares, it is estopped to prove against one

who has bought the shares in good faith, or even one who has paid one call or assessment to a third person on the strength of the certificate, that it was issued improvidently. *In re Bahia, etc., Co.* L. R. 3 Q. B. 584; *Hart* v. *Frontino, etc., Co.* L. R. 5 Exch. 111.

Where the president, who was also transfer agent of a railroad company, issued an immense amount of false and fraudulent certificates of shares, beyond the whole capital, the company, after "a decade of litigation," was held bound to indemnify the honest purchasers. *New York & New Haven R. Co.* v. *Schuyler*, 34 N. Y. 30. In the present case, the certificate, though false in fact, was genuine; that is, it was given by the recording officer who had the custody of the records, and had a right to give it, and Kimball was justified in acting upon it. The case may likewise rest upon the other familiar principle, that, of two innocent persons, he must suffer who has misled the other. That the recording officer was the same person as the treasurer whose powers he was certifying, was the act of the corporation itself, and cannot affect the operation of the certificate.

The savings bank is not a party to this action, and does not appear to have been called on to defend it; and therefore my decision will not prevent that corporation from taking such measures as it may be advised to take, by bill or otherwise, to establish whatever rights it may have in the premises. If the tenant does not choose to pay the money at once, there may be a considerable time in which such rights can be tested with effect within this jurisdiction. The question for me is whether the demandant has a sufficient legal title to recover possession from the mortgagor himself.

The defence has called attention to the receipt given by Kimball, in which he agrees to reconvey the securities assigned to him upon repayment of the purchase money within six months; and it is contended that Pratt had not even apparent authority to make a pledge, or mortgage, or conditional assignment, and therefore no title whatever passed to Kimball. The case finds that Kimball paid the full face value of the mortgage,—that is, its utmost possible value,—and I do not understand the reasons which induced him to sign this receipt. They are not explained in the statement of facts. It may be that he thought the national bank for which he was acting had no lawful power to buy a mortgage, or it may be that Pratt wished to retain power to repurchase in order to conceal his fraud if his speculations should turn out well. If the latter, there might be some question of *bona fides;* but it is found as a fact that Kimball acted in good faith and without knowledge of fraud. Having in fact bought these mort-

gages, which Pratt had an apparent power to sell, I do not find that his title is rendered void by his giving this unexplained defeasance, so that a *bona fide* purchaser from him, without notice even of the defeasance, can be said to have no title whatever; for that is all that I am called upon to decide at present.

Since the argument, a brief has been handed me, denying the jurisdiction of the court, on the ground that this is a "suit founded on contract in favor of an assignee," and that the assignor could not have maintained it. St. 1875, *c.* 137, § 1, (18 St. 470.)

I have already shown that this is a real action for possession of land. It is, therefore, not within the prohibition. *Smith* v. *Kernochen,* 7 How. 198; *Sheldon* v. *Sill,* 8 How. 441, 449, per *Grier,* J. Besides, the law of 1875 excepts from the prohibition promissory notes negotiable by the law-merchant. It is ingeniously argued that notes were made negotiable by the statute of Anne, and not by the law-merchant. It is true that Lord Holt insisted that promissory notes were not negotiable by the law of England, and that a statute became necessary to put them on the footing of bills of exchange. Judge Story says:

"There was a long struggle in Westminister Hall as to the question whether promissory notes were negotiable or not at the common law; for there could be no doubt that they were by the law-merchant; at least, as recognized upon the continent of Europe. Lord Holt, most strenuously, and with a pride of opinion not altogether reconcilable with his sound sense and generally comprehensive views, maintained the negative." Story, Prom. Notes, § 6.

At present, it is generally admitted that notes which are payable in money at a time certain, to order or bearer, are negotiable by the law merchant. *In re Chandler,* 1 Low. 478, and authorities there cited.

If it be asked why congress mentions the law-merchant, the answer is that they wished to refer to a recognized standard, and did not intend to adopt the statutes of those states which have varied the general law in this respect. Since the statute of 1875, it has been understood that an assignee of those notes which are universally recognized as negotiable, may sue in the circuit courts, though his assignor could not. *Seckel* v. *Backhaus,* 7 Biss. 354; *Cooper* v. *Town of Thompson,* 13 Blatchf. 434. The exceptions are of notes under seal, (*Coe* v. *Cayuga Lake R. Co.* 8 Fed. Rep. 534,) and of those payable in something not money, etc.

Judgment for the demandant.