## McMAN OIL & GAS CO. v. HURLEY et al.

Circuit Court of Appeals, Fifth Circuit. March 19, 1928.

No. 5050.

1. **Mines and minerals ⬦➞105(2)—Authority to execute conveyance was conclusively presumed, where secretary's certificates showed resolutions of executive committee and directors authorizing sale.**

Where certificates of secretary, showing resolutions of executive committee and board of directors of corporation authorizing and approving sale of oil lease, were issued and delivered to purchaser, it was conclusively presumed that the resolutions were adopted and that corporate authority was given to execute conveyance.

2. **Corporations ⬦➞422(1)—Corporation is estopped to deny authorized representations of its officers and agents.**

Corporation is estopped to deny representations of its officers and agents, made within the scope of their authority.

3. **Frauds, statute of ⬦➞63(2)—Purchaser's oral agreement, after sale of oil lease, to reconvey, held inadmissible under statute.**

Alleged oral agreement of purchaser of oil lease, after sale was made, to reconvey upon return of purchase price within 60 days, *held* inadmissible under statute of frauds.

4. **Evidence ⬦➞230(3)—Title, having passed, cannot be impeached by vendor's declaration that it passed conditionally.**

After title to property has passed to purchaser, it cannot be impeached by the vendor's declaration that sale was conditional only.

5. **Mines and minerals ⬦➞74—Failure of vendor of oil lease to attempt to comply with alleged condition permitting repurchase within time agreed rendered purchaser's title absolute.**

If purchaser of oil lease entered into agreement with vendor to reconvey on return of purchase price within 60 days, purchaser's title became absolute, where no attempt was made to comply with the condition within the time limit agreed upon.

6. **Evidence ⬦➞244(11)—Declaration that · its officer had agreed to give bribe for sale of oil lease held not binding on purchaser corporation and insufficient to show bribery.**

Purchaser of oil lease, sued by receivers of vendor corporation to set aside conveyance as fraud on creditors, *held* not bound by declaration of vendor's officer concerning agreement of purchaser's officer to give bribe for sale, since conversation was not part of res gestæ but constituted mere narration of past event, and charge of bribery was therefore not sustained.

7. **Fraudulent conveyances ⬦➞298(1)—Evidence held insufficient to support finding that sale of oil lease by corporation at time of financial embarrassment and decline in price of oil was made to defraud creditors.**

In suit by receivers of oil company to set aside corporation's sale of oil lease, made at time price of oil had considerably declined and corporation was financially embarrassed, evidence *held* insufficient to support finding that sale was made with intent to hinder, delay, or defraud creditors, notwithstanding close family relations between officers and stockholders of two companies and profits realized from property after sale, where insolvency of grantor was not satisfactorily shown.

8. **Fraudulent conveyances ⬦➞249—Year's delay by receivers held to bar suit to set aside sale of corporation's oil lease as fraud on creditors.**

Suit by receivers of oil company to set aside sale of corporation's oil lease as fraud on creditors *held* barred by laches, where receivers delayed bringing suit for one year, after having acquired knowledge of all essential facts upon which suit was based, on account of belief that transaction was profitable to corporation.

9. **Fraudulent conveyances ⬦➞248—Vendor's receivers on purchaser's refusal to reconvey oil lease as agreed were required to act promptly to set aside sale as fraud on creditors.**

Receivers of oil company, upon receiving notice of refusal of purchaser of oil lease to reconvey in alleged violation of agreement, were required to act promptly to set aside sale on account of fraud, especially in view of fluctuation in prices of oil-producing properties, and receivers could not wait and determine in the light of subsequent events whether it would be to their advantage to recognize the sale as valid.

Appeal from the District Court of the United States for the Northern District of Texas; James Clifton Wilson, Judge.

Suit by P. J. Hurley and another, receivers of the Gilliland Oil Company, against the McMan Oil & Gas Company. From a decree for complainants defendant appeals. Reversed and remanded, with directions.

John Rogers, of Tulsa, Okl., Harry H. Rogers, of San Antonio, Tex., A. B. Flanary, of Dallas, Tex., A. H. Carrigan, of Wichita Falls, Tex., and R. L. Batts, of Austin, Tex. (Carrigan, Britain, Morgan & King, of Wichita Falls, Tex., and Flanary & Aldredge, of Dallas, Tex., on the brief), for appellant.

T. R. Boone, of Wichita Falls, Tex., John M. Atkinson, of St. Louis, Mo., J. M. McCormick, of Dallas, Tex. (McCormick, Bromberg, Leftwich & Carrington, of Dallas, Tex., Atkinson, Rombauer & Hill, of St. Louis, Mo., Boone & Humphrey, of Wichita Falls, Tex., and Robert H. Richards, of Wilmington, Del., on the brief), for appellees.

Before WALKER, BRYAN, and FOS-TER, Circuit Judges.

BRYAN, Circuit Judge. On May 11, 1921, the Gilliland Oil Company conveyed to the McMan Oil & Gas Company an interest in oil-producing land, designated in the record as the Hardin lease. The conveyance was absolute in form, and was authorized by the executive committee of the Gilliland company's board of directors. A resolution of the board of directors, dated May 19, purporting to approve the sale, appears in the minutes; but whether it was adopted by a majority vote depends upon conflicting evidence as to whether a director named McCullough was present. However, it is shown by undisputed testimony that the secretary certified that both sets of resolutions were regularly adopted by a majority vote, and his certificates to that effect were delivered by the general attorney of the Gilliland company to the general attorney of the McMan company after the latter had insisted upon the sale being approved by resolution of the directors.

On November 20, 1922, this suit was brought by P. J. Hurley and John J. Satterthwait, as receivers of Gilliland company, against the McMan company, to have the conveyance in question decreed to be a mortgage, or to have been made with intent to hinder, delay, or defraud creditors of the grantor. The bill alleged that at the time of such conveyance the Gilliland company was insolvent, in the sense that it was unable to pay its debts as they matured in the course of business. Appellant defended on the grounds that it paid adequate consideration, was the purchaser of an unconditional title in good faith, without notice of the grantor's insolvency, and that the suit was barred by laches. The purchase price, which was promptly paid, was a million dollars. Before this suit was brought, the net profits exceeded that sum. On final hearing, the District Court held that the sale was made in fraud of creditors, and that appellant had notice, though not actual knowledge, thereof, and ordered that the sale be set aside, and that appellant account to the receivers for the profits it had received over and above the purchase price.

The Gilliland company was engaged in trading in oil properties and in producing and selling oil therefrom. It was incorporated under the laws of Delaware, with its principal office at Tulsa, Okl. In July of 1921 Hurley and Satterthwait were appointed receivers of that company by the Federal District Court of Delaware and ancillary receivers by the Federal District Court for the Northern District of Texas. The bill of complaint was filed on behalf of preferred stockholders, and charged the sale of property in Louisiana for less than its value, but did not attack the sale of the Hardin lease to appellant. In May of 1922 the Gilliland company was reorganized, and its assets were ordered returned to it as a solvent, going concern; and, except for the purpose of bringing this suit, the receivership was terminated.

At the beginning of the year 1921, crude oil and its by-products commanded high prices; but in January of that year those prices began to decline rapidly. The price of crude oil dropped from $3.50 to $4 per barrel in January to $1.50 by May 11, the date of the conveyance in question. It continued to decline until in September, when it fell to the low level of $1 per barrel. Of course, the price of by-products declined in proportion. Beginning in September, prices began to advance. During this period of depression many oil operators either failed or were seriously embarrassed. Many banks that financed oil operators were in a precarious condition, and some of them also failed. The Gilliland company found itself in great financial difficulty, although it is not claimed that at any time its liabilities exceeded its assets. John W. Gilliland was its president, and owned about 75 per cent. of its common stock. Hurley, who was later one of its receivers, and J. H. Boxley were active vice presidents. Gilliland and Boxley were interested in a number of banks in Oklahoma and Texas, and resorted to the devices of kiting checks and making accommodation notes to secure money for their corporation, which continued to expand its business by making additional purchases until as late as the middle of April. In order to raise the money which the corporation needed to pay its debts, including the debts evidenced by fictitious paper in banks, which, though not definitely fixed by the evidence, ranged somewhere between one and two million dollars, the disputed sale of the Hardin lease was made, and the proceeds of the sale were applied in the payment of its debts. The McMan Oil & Gas Company also had its principal office at Tulsa, and, as its name implies, was engaged in the oil-producing business. J. A. Chapman, R. M. McFarlin, and H. G. Barnard were its president, vice president, and treasurer, respectively, and together owned more than 75 per cent. of its capital stock. They were familiar with the Hardin lease, by reason of the fact that the McMan company

24 F.(2d)—49½

owned a one-eighth interest in it at the time of the conveyance by the Gilliland company. Gilliland, Boxley, Chapman, McFarlin, and Barnard were all related to each other by blood or marriage. Negotiations for the conveyance of the Hardin lease were conducted by Boxley and Barnard, and, according to their testimony, that conveyance was intended to evidence an outright, unconditional sale. The court found that the fair market value of the property at the time of the transaction was approximately $1,784,000. The Hardin lease represented about one-third of the value of the Gilliland company's total assets. Approximately $3,600,000 of preferred stock had been issued and was held by investors living in New York.

About a month after the conveyance was made, representatives of preferred stockholders called upon Chapman with the view of reacquiring the property. They stated to him that they had been informed by Gilliland that this could be accomplished by returning the purchase price of a million dollars with interest within a reasonable time. Gilliland testified that he had made a statement to this effect to the board of directors of Gilliland company at the time the resolution approving the sale was adopted. He further testified that he never discussed the return of the property with Chapman, but that Barnard agreed, after the sale was made, to a reconveyance upon the return of the purchase price within 60 days. Chapman and Barnard denied that there was any such understanding, but Chapman offered to reconvey the property upon those terms being accepted and complied with within two weeks.

Upon request, the time was extended about two weeks more, but Chapman's offer was not accepted. In the meantime, engineers made an investigation and reported to the parties interested in securing a reconveyance that the property was worth less than the sum that the McMan company had paid for it. In September, Hurley, one of the receivers, made practically the same offer, but it was declined. J. W. Hayes, secretary of the Gilliland company, testified that he heard Barnard say that that company could have the property back at any time it returned the money, but that witness was unable to say that the statement was made before the contract was executed. J. H. Maxey, general attorney for the Gilliland company, testified that, after the sale was agreed upon, but before the resolution of the board of directors approving it was passed, Boxley told him that Barnard had agreed to pay Boxley a bribe of $150,000

for making the sale. That witness, however, does not claim that he disclosed this information to the board of directors, or to any of the other officers of the company he represented. Besides this, he co-operated with the general attorney of the McMan company in the preparation of the final papers, and never mentioned the alleged bribe to him, and represented the receivers as attorney throughout the receivership proceedings. Hurley, one of the receivers, testified that he first learned of Boxley's alleged admission to Maxey of being promised a bribe by Barnard in November of 1921, but admitted that Barnard denied the truth of the charge. And there was no direct evidence that the corrupt agreement was in fact made. The testimony of the several witnesses for appellees, to the effect that appellant's officers had stated after the sale was made that it would reconvey upon the return of the purchase price, was received over appellant's objection and exception, as was also the testimony relating to Maxey's alleged conversation with Boxley on the subject of a bribe being paid by Barnard. In addition, Boxley denied that any such conversation was ever had, and both he and Barnard denied that the alleged bribe was ever offered.

The testimony discloses that the principal officers and stockholders of the McMan company knew in a general way that the Gilliland company was in need of money to pay its pressing obligations, and in order to get it was under the necessity of disposing of some of its holdings at a possible sacrifice because of greatly depressed, market conditions; but it does not show that they had knowledge or could reasonably be charged with notice that the sale of the Hardin lease would so reduce its assets as to bring about a condition of insolvency.

[1, 2] In our opinion it sufficiently appears that corporate authority was given to execute the conveyance of the Hardin lease to appellant. The resolutions, both of the executive committee and of the board of directors, purport to have been adopted by majority votes. It is conclusively presumed that they were so adopted by reason of the certificates to that effect issued by the secretary and delivered to appellant by the general attorney of the Gilliland company. A corporation is estopped to deny the representations of its officers and agents made within the scope of their authority. Whiting v. Wellington (C. C.) 10 F. 810; Holden v. Whiting (C. C.) 29 F. 881; Prentiss Tool & Supply Co. v. Godchaux (C. C. A.) 66 F. 234; Commonwealth v. Reading Savings

Bank, 137 Mass. 431; Holden v. Phelps, 141 Mass. 456, 5 N. E. 815. The conveyance was not a mortgage. Under no phase of the evidence was the consideration shown to be a loan. The utmost that was claimed by witnesses for appellees was that a sale was made upon condition that the property sold could be repurchased.

[3-6] That testimony went no further than to show that the condition was imposed by appellant after the sale was consummated; but it was oral testimony, and in our opinion was inadmissible under the statute of frauds. 27 C. J. 207. After title has passed, it cannot be impeached by the vendor's declaration that it was conditional. Greenleaf, § 189. But, assuming the admissibilty of that testimony, the right claimed was to repurchase within the definite period of 60 days. There was no testimony that such right should continue for a reasonable time, as is contended by appellees. No attempt was made to comply with the alleged condition within the time limit that was agreed upon, and so appellant's title became absolute. Campbell v. Fetty (C. C. A.) 271 F. 671. We are of opinion also that the evidence, even of appellees, fails to show that the conveyance was made with intent to hinder, delay, or defraud creditors of the Gilliland company. The charge of bribery must fail, because it is only supported by an alleged declaration of an officer of appellees which it is not claimed was made until after the execution of the contract of sale. The alleged conversation between Boxley and Maxey was not a part of the res gestæ, or made during the continuance or in pursuance of a common plan designed by Boxley and Barnard, but was a narrative of a past event. Under no possible view could it be binding on appellant. There was no other circumstance tending to sustain the charge of bribery.

[7-9] The evidence does not appear to us sufficient fairly and reasonably to support the conclusion that the Gilliland company made the sale with intent to hinder, delay, or defraud its creditors. In the first place, insolvency of that company is not satisfactorily shown. The most that appears is that that company, in order to pay its debts, was obliged to sell some of its holdings at a sacrifice because of depressed market conditions. No improper use was made of the proceeds of the sale, but they were devoted to the payment of debts. The officers of the McMan company were, of course, acquainted with the financial situation that confronted oil companies generally, and besides knew that the Gilliland company was badly in need of money. But, as it appears to us, the evidence falls short of showing that they were chargeable with notice that the Gilliland company was insolvent, even conceding the existence of a state of actual insolvency. In arriving at this conclusion, we have given full weight to the circumstance that close family relations existed between the principal officers and stockholders of the two companies. But, aside from all the foregoing considerations, we are of opinion that this suit is barred by laches. Hurley, one of the receivers, and formerly a vice president of the Gilliland company, knew of the sale in question. The original suit, in which he was appointed one of the receivers, was brought in July of 1921. It is significant that the sale here complained of was not attacked during the entire period of the receivership, which was not terminated until May of 1922. Certainly the preferred stockholders, on whose behalf the receivership proceedings were instituted, knew of the sale, for, within a few weeks after it was made, they negotiated for a repurchase. The reason that they did not reacquire the Hardin lease may reasonably be ascribed to their belief that it was not worth more than the price at which it had been sold. Hurley was notified in September of 1921 that the purchaser would not reconvey the property, but would insist upon holding the title it had acquired. Upon receiving notice of the refusal of the purchaser to reconvey, it became the duty of the receivers to act promptly, especially in view of the great fluctuation in the prices of oil-producing properties. They could not wait and determine in the light of subsequent events whether it would be to their advantage to recognize the sale as valid or to repudiate it as invalid. Hurley excused the delay until November of 1921 on the ground that he did not earlier learn of Barnard's alleged bribery of Boxley. But it stands admitted that there was a delay in bringing suit of a year after Hurley was in full possession of all the essential facts on which the suit was based. In the meantime it developed that the purchase of the Hardin lease was profitable to appellant. It is not equitable to allow appellees so to speculate on the value of the property involved. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

The decree is reversed, and the cause remanded, with directions to dismiss the bill of complaint.