## HINCHMAN v. CONSOLIDATED ARIZONA SMELTING CO.

(District Court, D. Maine. August 3, 1912.)

No. 672, Eq. C. C.

1. COVENANTS (§ 70*)—COVENANTS RUNNING WITH THE LAND—SEPARATE AGREEMENT IMPOSING BURDEN ON PROPERTY.

A written agreement was made for the sale of copper mining property for the price of $1,000,000, of which $100,000 was to be paid when the deed was made and the remainder by a percentage of the net earnings of the mines. A deed was made without reservation, but at the same time and as a part of the same transaction a separate agreement was executed for the payment of the remaining purchase money in accordance with the agreement of sale. Both agreements provided that they should be binding on the successors and assigns of the parties. *Held*, that they were not mere personal contracts, to be performed by the promisor, although it should part with the property, but constituted covenants which ran with the land, and that subsequent purchasers with notice took subject thereto.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 70, 71; Dec. Dig. § 70.*]

2. BANKRUPTCY (§ 268*)—SALE OF PROPERTY—TITLE OF PURCHASER—UNRECORDED INCUMBRANCE.

Under Civ. Code Ariz. 1901, par. 749, requiring certain conveyances to be recorded in order to be valid as to creditors and subsequent purchasers without notice, but providing that, although unrecorded, they shall be valid as between the parties and their heirs, and as to all subsequent purchasers with notice, a purchaser of mining property in Arizona, sold by the trustee in bankruptcy of a corporation under an order directing the sale of all the bankrupt's right, title, and interest therein, and conveyed by a quitclaim deed, took subject to an unrecorded agreement which bound the bankrupt to pay to its grantor a certain percentage of the net profits from the mines until the purchase money should be fully paid, of which agreement the purchaser had actual notice before the sale was confirmed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 372–379; Dec. Dig. § 268.*]

In Equity. Suit by Charles S. Hinchman against the Consolidated Arizona Smelting Company. On final hearing. •Decree for complainant.

Charles H. Burr, of Philadelphia, Pa., and Benjamin Thompson, of Portland, Me., for complainant.

J. Markham Marshall, of New York City, for respondent.

HALE, District Judge. This case comes before the court upon bill, answer, replication and proofs. The complainant is a citizen of Penn-

sylvania; the defendant, a citizen of Maine. The complainant states the case substantially as follows: On September 15, 1906, the Arizona Blue Bell Copper Company, a Delaware corporation, owned certain mines in Yavapai county, Ariz., which are known in this case as the "Blue Bell" mines. On that date the Delaware Company made an agreement with one John L. Elliott for the sale of these mines. The price was to be $1,000,000—$10,000 on the execution of the agreement, $90,000 on delivery of the deed, and the balance of $900,000 to be paid out of the net earnings of the property, in the manner and on the terms provided in the agreement of sale. On September 24, 1906, Elliott assigned the agreement of sale to the New Jersey Consolidated Arizona Smelting Company, a New Jersey corporation of which he was the vice president. On November 15, 1906, the Arizona Blue Bell Copper Company conveyed the Blue Bell mines to the Consolidated Arizona Smelting Company, a New Jersey corporation. At the same time the Arizona Blue Bell Copper Company received from Elliott, or from the Consolidated Arizona Smelting Company, the additional sum of $90,000, and the deed was recorded in Yavapai county. It contained, however, no reference to the $900,000, the balance of the purchase money. On the same day the New Jersey Consolidated Smelting Company made a written agreement with the Arizona Blue Bell Copper Company, providing for the payment of the $900,000 in accordance, as it is claimed, with the terms of the agreement of sale. The agreement of September 15, 1906, and the agreement of November 15, 1906, were, by the complainant, recorded in the Deed Book of Yavapai county, Ariz., on January 4, 1910. Each of the agreements contained a provision that it should be binding upon the successors and assigns of the parties. In the Elliott agreement, namely, of September 15, 1906, was the following clause:

"Mr. Elliott further covenants and agrees to pay or cause to be paid to the Blue Bell Company, until it shall have received the aggregate sum of one million dollars ($1,000,000), twenty-five per cent. of the net profits resulting from the operation of the said mining properties. The said payments shall be made quarterly on the 1st days of January, April, July, and October, or as soon thereafter as the net profits [for the preceding quarter can be conveniently ascertained]. The net profits herein referred to shall be net proceeds from the operation of the said mining property after deducting the cost of mining, necessary development work (but not including purchase of new machinery), transportation, sampling, treatment, and smelting, plant superintendence, and all proper charges incidental thereto, but not the rent payable under the said lease of the said mining property. Mr. Elliott will also procure to be executed by the Arizona Smelting Company, a corporation of the state of New Jersey, operating at Humboldt, Ariz., a contract for the smelting of all the ores produced from the said mining property for a period of five years substantially in the form hereto annexed."

The agreement between the Blue Bell Company and the Consolidated Arizona Company, namely, of November 15, 1906, contained the following clause:

"The Consolidated Company hereby agrees to pay or cause to be paid to the Blue Bell company twenty-five per cent. of the net profits resulting from the operation of the said 'Blue Bell,' 'Blue Coat,' and 'Blue Bug' Patented Mining Claims, until the said Blue Bell Company shall have received the aggregate sum of one million dollars ($1,000,000). Said payments shall be

made quarterly on the 1st days of January, April, July, and October in each year, or as soon thereafter as the net profits for the preceding quarter can be conveniently ascertained. Such net profits shall be the net proceeds from the operation of the said mining properties after deducting the cost of mining, necessary development work (but not including the purchase of new machinery), transportation, sampling, treatment, and smelting, and plant superintendence, and all proper charges incidental thereto, but not including the rent payable under the lease of said mining properties dated 29th December, 1905, to the Arizona Exploration Company."

The complainant says that under these agreements, the covenants providing for the payment of the 25 per cent. of the net profits arising from the operation of the mining properties constituted a covenant running with the land, and are, in accordance with the express provisions of the agreement, binding upon the defendant corporation, which is the successor corporation to the property and assets of the Consolidated Arizona Smelting Company, the New Jersey Company. On April 27, 1908, the Consolidated Arizona Smelting Company, the New Jersey Company, was declared bankrupt in the District Court for the District of New Jersey. On October 6, 1908, an order of sale was entered in said court directing that all the bankrupt's right, title, and interest in and to the Blue Bell mine, a copper mine situated in Mayer, Yavapai county, Ariz., be sold by the trustee in bankruptcy. On November 10, 1908, pursuant to the order of sale, the Blue Bell property was sold to Edwin S. Hooley and another, for and on behalf of such stockholders and creditors of the Consolidated Arizona Smelting Company as might join in a plan of reorganization of said company, issued under date of December 19, 1908, and was subsequently conveyed to the Consolidated Arizona Smelting Company, the defendant corporation, the same having been organized by Hooley and another to carry out the plan of reorganization. The complainant says that Hooley and another and their associates knew of the provisions in the agreements of September 15, 1906, and November 15, 1906, and were fully notified and informed as to such provisions. On December 17, 1908, a rule to show cause was issued upon a petition presented in behalf of the Arizona Blue Bell Copper Company to the District Court in New Jersey, asking to have a decree entered that the sale was subject to the right of said company, as assignees, to receive the $900,000, the balance of the purchase money. On December 17, 1908, the sale was confirmed by the referee. On December 19, 1908, the court refused the petition because it appeared "that the trustee is selling only his right, title, and interest in and to property against which the petitioner, the Arizona Blue Bell Copper Company, asserts a claim." On December 21, 1908, a settlement was made, and a quitclaim deed was delivered by the trustee to Hooley and another; also a quitclaim deed from the reorganization committee to the defendant corporation, this latter deed being indorsed by the defendant corporation as "a quitclaim deed." The complainant says that all the rights of the Arizona Blue Bell Copper Company to the $900,000, balance of purchase price passed to him by virtue of the assignments and legal proceedings recited in the bill; that by the decree of the Circuit Court of the United States for the District of Delaware, entered March 29,

1911, the clerk of the Circuit' Court of the United States for that district on the same day conveyed to him all the right, title, and interest which the Arizona Blue Bell Copper Company had to receive the balance of the $900,000 purchase money.

It is not necessary to state all the allegations of the answer. No serious question is made over the facts as stated by complainant. The defendant, however, explicitly denies all the conclusions of the bill. It says that the two agreements were kept off the records in order to defraud the creditors of one Addicks, who was the owner of substantially all the capital stock of the Arizona Blue Bell Copper Company; that these agreements were not binding upon the defendant; that they did not run with the land; that they were absolutely void and of no effect, so far as relates to the defendant corporation.

[1] 1. The first sharp issue in the case is presented by the complainant's contention that the agreement of September 15, 1906, and that of November 15, 1906, relating to the payment of the balance of the purchase money, touched and concerned the land; that they run with the land, and are binding upon the defendant company, the grantee of the land. He urges, too, that the defendant company took the land charged with a burden upon it, and must be bound to assume the burden with the land. The defendant denies this, and says that these agreements do not touch or concern the land; that there was no privity of estate between the New Jersey Company and the Blue Bell Company, which the agreements were intended to support; and that the defendant took the land free from any burden relating to the unpaid purchase money. It will be seen that these agreements to pay the balance of the purchase money out of the profits of the operation of the mines were made apart from the deed itself. There can be no doubt, however, that all the instruments in the case are to be taken as a part of one transaction. Each of the agreements contains a covenant, binding assigns. The learned counsel, both for the complainant and defendant, have discussed with learning and ability the considerations which determine the question relating to whether a covenant "runs with the land." They have quoted from Sir Henry Maine, and from the text of that remarkably brilliant book of Mr. Justice Holmes on "The Common Law." The complainant contends that the question in the case before us arises upon an agreement granting an estate in fee simple, but reserving the right of payment of the balance of the purchase money, in form of a royalty, until the sum should amount to $900,000, and that this is in the nature of a contract which, under the earliest principles of the common law, "runs with the land"; that the essence of such a covenant is that it must concern the land itself, and must increase or decrease the value of the land. He refers to the old case, Dickinson v. Hoomes, 49 Va. 353, and the Spencer Case, 1 Smith's Leading Cases, 174, where it is held that when the thing to be done concerned the land itself, and did not amount to a collateral undertaking, the covenant is one which runs with the land. The early Pennsylvania case, Dunbar v. Jumper, 2 Yeates (Pa.) 74 (1796) is also cited, where the conveyance of a mill in fee had been accompanied by a covenant of

the grantee, that the grantor and the lawful heir of his body should have the privilege of grinding certain grain in the mill free, and this was held to be a covenant which bound the assignee of the grantee.

It is urged by the learned counsel for the defendant that the covenant involved in this case is not one which touches and concerns the land; that it is a personal agreement, and that there was no such privity of estate shown between the complainant and defendant as is essential to allow the covenant to "run with the land"; that the case presents a collateral contract; that the courts in equity should not enforce it as being such a contract as touches and concerns the operation of the land, and so runs with the land. This question raises a very interesting study of the early cases, and of the history of the common law. It seems to me that there is strong equitable ground for holding that the agreements before me constitute a covenant which "runs with the land"; that a merely personal contract could not have been within the contemplation of the parties; that it could not have been intended by the parties that the original New Jersey corporation should pay the 25 per cent. of the profits after it had parted with the land; that the contract was one which would naturally be performed by the party who owns and operates the land, and takes the ore out of it. Beasley v. Texas & Pacific Railway Co., 191 U. S. 492, 24 Sup. Ct. 164, 48 L. Ed. 274; Norcross v. James, 140 Mass. 188, 2 N. E. 946.

Without reference to the interesting and historic question relating to covenants which run with the land, I am of the opinion that the express covenant in the agreements in the case at bar is decisive of the case. The question seems to me not so much one of *status* as of *contract*. The covenant provides that it shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto. In "The Common Law," which has been often referred to by counsel, the two chapters upon "Succession" are full of interest and suggestion. In closing those chapters, Mr. Justice Holmes observes:

"The history of early law everywhere shows that the difficulty of transferring a mere right was greatly felt when the situation of fact from which it sprung could not also be transferred. Analysis shows that the difficulty is real. The fiction which made such a transfer conceivable has now been explained, and its history has been followed until it has been seen to become a general mode of thought. It is now a matter of course that the buyer stands in the shoes of the seller, or, in the language of an old law book, that 'the assign is in a manner quasi successor to his assignor.' Whatever peculiarities of our law rest on that assumption may now be understood."

In the High Court of Chancery (1848) in Tulk v. Moxhay, 2 Phillips, 744, 777, Lord Chancellor Cottenham said:

"That the action does not depend upon whether a covenant runs with the land is evident from this, that, if there was a mere agreement and no covenant, this court would enforce it against a party purchasing with notice of it; for, if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased."

On this point, learned counsel for the complainant cite Wiggins Ferry Co. v. Railway Co., 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055. In the case before me, there was a grant of land by deed. Certain agreements were made, separate from the deed, but as a part·of the transaction. ˙Those agreements provide that the balance of the purchase money should be paid out of the profits of the operation of the mines, and that they should be binding upon the successors and assigns of the parties. Without restating the case, it may be said generally that the agreements for sale show a grant in fee simple, but reserve the right of payment of the balance of the purchase money in the form of a royalty, until the same shall amount to $900,000. I think upon a fair construction of the evidence it must be said that the defendant is charged with notice of the agreements. Upon the whole case, the defendant must be held to have acquired the land charged with notice of the burden upon it, and it must be bound to assume the burden with the land. Having taken the land with notice of the burden upon it, the defendant should not be relieved from such burden.

[2] 2. Did the defendant derive title, from the trustee in bankruptcy, of the land, without incumbrance? Or did it take only the title held by the bankrupt?

˙ It is urged by learned counsel for the defendant that under the bankruptcy law, and under the recording acts of Arizona, any right which the complainant may have had has been lost by reason of the nonrecording of the agreements.

It is contended, too, that these agreements were deliberately withheld from record, and that the creditors loaned money to the New Jersey Company upon faith of the absolute title conveyed to the New Jersey Company by the Blue Bell Company.

In York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, it was held by the Supreme Court that the trustee in bankruptcy is vested with no better title to the property· than the bankrupt had when the trustee's title accrued. The case before me is not affected by the act of June 25, 1910, which substantially gives to general creditors existing at the time of the bankruptcy, the status of lien creditors; for here the bankruptcy occurred and the agreements were recorded previous to the amendment of 1910. There have been brought to my attention the Arizona recording acts (Revised Statutes of Arizona 1901, par. 749), which provide that certain conveyances shall be void as to all creditors and subsequent purchasers for valuable consideration without notice, unless they shall be acknowledged and filed with the Recorder, to be recorded as required by law. The paragraph contains this clause:

"But the same, as between the parties and their heirs, and as to all subsequent purchasers, with notice thereof, and without valuable consideration, shall nevertheless be valid and binding."

I have not been able to examine all the decisions of the Texas court, and of some other state courts cited by learned counsel; but it is sufficient to say that, on examination of such of them as I have been able to find, and upon a review of the facts in the case at

bar, I am of the opinion that the defendant must be held to be bound by the agreements in this case. The whole case, taken together, leads to the conclusion that, under the decree of the bankruptcy court, the trustee sold only his right, title, and interest to the property, and that all parties understood that the defendant was taking, by a quitclaim deed, only the property which the bankrupt had. I think it must be held that the grantee took with such notice as to put it on inquiry, at least, as to what, if any, defect in the title existed. The case shows, in my opinion, that notice of the unrecorded agreements was brought home to the defendant prior to the confirmation of the sale. The answer raises the question of fraud on the creditors of Addicks, the principal stockholder of the Blue Bell Company. I do not find that this charge has been sustained by the evidence. I am of the opinion that the defendant took only the title held by the bankrupt; that it took such title with knowledge of the existing burden.

Upon a careful examination of the whole case, I am of the opinion that the title obtained by the defendant was acquired subject to the agreements of September 15, 1906, and November 15, 1906.

Let there be a decree for the complainant for an injunction, and for an accounting as prayed for in the bill. The complainant may file a draft decree in this court on or before August 15, 1912. The defendant may file corrections within 10 days thereafter; the decree to be settled by the court September 2d next. A master will be appointed. The complainant recovers his costs.