## CONSOLIDATED ARIZONA SMELTING CO. v. HINCHMAN.

(Circuit Court of Appeals, First Circuit.  March 30, 1914.)

No. 1000.

1. COVENANTS (§ 70*) — COVENANTS RUNNING WITH THE LAND — EQUITABLE CHARGE—PERSONAL COVENANTS.

A contract for the sale and purchase of several mining properties called for a payment of $100,000 when the deed should be delivered, and for a percentage of the net earnings of mining operations until the vendor had received in the aggregate $1,000,000. The purchaser assigned the contract, and his assignee obtained a deed conveying unqualified title, and he at the same time executed a contract calling for quarterly payments to the vendor of a percentage of net profits of mining operations until the vendor had received in the aggregate the $1,000,000. Both contracts were made binding on the successors and assigns of the parties. The contracts were not recorded. *Held,* that the covenants to pay a percentage of the "net proceeds from the operation of said mining properties after deducting the cost of mining, necessary development work (but not including purchase of new machinery), transportation, sampling, treatment and smelting, plant superintendence, and all proper charges incidental thereto," did not run with the land, but were merely personal, and did not create an equitable charge on the land, and a purchaser from the assignee, pursuant to order of the bankruptcy court on the bankruptcy of the assignee, with notice of the agreements, was not bound to operate the properties and pay the vendor the percentage of the net profits.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 70, 71; Dec. Dig. § 70.*]

2. VENDOR AND PURCHASER (§ 265*)—VENDOR'S LIEN—COVENANTS RUNNING WITH THE LAND—SUBSEQUENT PURCHASER.

Where an agreement of a purchaser of mining properties to pay a percentage of the net profits of operations of the properties until the vendor was paid a specified aggregate sum was not a legal covenant running with the land, or an agreement expressly charging the land, equity could not intervene on the ground of a vendor's lien for the unpaid price of the land, and so charge a subsequent purchaser with liability to operate the properties and pay the percentage of net profits.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 492, 700–712; Dec. Dig. § 265.*]

3. COURTS (§ 365*)—CONTROLLING DECISIONS—DECISIONS OF STATE COURTS.

The decision of the highest court of Arizona that there is no implied lien for unpaid purchase money must be given effect by the federal courts in determining whether real estate located in Arizona is subject to a lien for the unpaid price, and no lien can arise at law or in equity from the mere fact that there is a document in writing evidencing an agreement to pay a further price for land situated in Arizona, but to create such lien the amount of the price due must be expressly charged on the land.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Dec. Dig. § 365.*

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468; Converse v. Stewart, 118 C. C. A. 215.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. BANKRUPTCY (§ 268*)—TRUSTEE IN BANKRUPTCY—TITLE—PURCHASER.
    Since a trustee in bankruptcy takes the property of the bankrupt with all the equities impressed on it by the bankrupt and with the equities in the bankrupt's favor, a purchaser from the bankrupt assumes no obligation not enforceable against the bankrupt.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 372–379; Dec. Dig. § 268.*]
    Aldrich, District Judge, dissenting.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit by Charles S. Hinchman against the Consolidated Arizona Smelting Company. From a decree (198 Fed. 907) for complainant, defendant appeals. Reversed and remanded, with directions.

J. Markham Marshall and Alexander B. Siegal, both of New York City (Van Vorst, Marshall & Smith, of New York City, on the brief), for appellant.

Charles H. Burr, of Philadelphia, Pa. (Benjamin Thompson, of Portland, Me., and John Chipman Gray, of Boston, Mass., on the brief), for appellee.

Before DODGE, Circuit Judge, and ALDRICH and BROWN, District Judges.

BROWN, District Judge. The decree of the District Court is in part to the effect that the appellant, Consolidated Arizona Smelting Company, a Maine corporation, now holds its title to mines in Arizona known as the "Blue Bell Mines," subject to two agreements of the Arizona Blue Bell Copper Company; the first, of September 15, 1906, with John L. Elliot, the second, of November 15, 1906, with the Consolidated Arizona Smelting Company, a New Jersey corporation, and "especially subject to the payment of the balance of the purchase price of $900,000, in accordance with the terms of said agreements."

The opinion of the District Court is reported in 198 Fed. 907.

The New Jersey corporation, party to the second agreement, was adjudged bankrupt April 27, 1908, and under direction of the bankruptcy court its mining property was sold; the purchaser took a deed from the trustee in bankruptcy and subsequently made conveyance to the appellant, the Maine corporation.

. The principal question before us is whether, by reason of its acquisition of title to the mines, the Maine corporation, appellant, became chargeable with certain payments of a share of the net profits resulting from the operation of said mining properties, as provided in the said agreements of September 15 and November 15, 1906.

The case of the complainant, appellee, is put upon two grounds:

1. That said agreements contain covenants that at law run with the land.

2. That even if the covenants do not run at law they create an equitable charge.

The written agreement of September 15, 1906, was to the effect that the Blue Bell Company agreed to convey to Elliot, and Elliot to pur-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

chase, certain mines and mining property in Arizona, together with the appurtenances, machinery, tools, and utensils on said premises; the conveyance thereof to be "made by full, covenant warranty deed, and the title thereto shall be a good and marketable title and free from encumbrances," excepting, however, a certain lease and certain claims which are not material in the present case.

In connection with the finding of the District Court that there is an unpaid balance of the purchase price amounting to $900,000, particular attention should be given to the second, third, and fourth paragraphs:

"Second. The price to be paid by Mr. Elliot for the said properties is the sum of one hundred thousand dollars ($100,000), ten thousand dollars ($10,-000) of which shall be paid upon the signing of this agreement, the receipt whereof is hereby acknowledged, and the remaining ninety thousand dollars ($90,000) shall be paid upon the delivery of the deeds to the said property, as hereinafter provided. Mr. Elliot further covenants and agrees to pay, or cause to be paid to the Blue Bell Company, until it shall have received the aggregate sum of one million dollars ($1,000,000), twenty-five per cent. (25) of the net profits resulting from the operation of the said mining properties. The said payments shall be made quarterly on the first days of January, April, July and October, or as soon thereafter as the net profits for the preceding quarter can be conveniently ascertained. The net profits herein referred to shall be the net proceeds from the operation of the said mining properties after deducting the cost of mining, necessary development work (but not including purchase of new machinery), transportation, sampling, treatment and smelting, plant superintendence, and all proper charges incidental thereto, but not the rent payable under the said lease of the said mining property. Mr. Elliot will also procure, to be executed by the Arizona Smelting Company, a corporation of the state of New Jersey, operating at Humboldt, Arizona, a contract for the smelting of all the ores produced from the said mining property for a period of five years, substantially in the form hereto annexed, marked 'A.'

"Third. The deeds of the said properties shall be delivered, and the remaining ninety thousand dollars ($90,000) of the purchase price, other than the twenty-five (25) per cent. of the net profits, shall be paid at the office of John L. Elliot, No. 71 Broadway, city and state of New York, on the fifteenth day of November, 1906, at 12 o'clock noon.

"Fourth. This agreement shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns."

The agreement of November 15, 1906, with the said New Jersey corporation (subsequently a bankrupt) recites that on or about September 24, 1906, the contract of September 15th and all rights thereunder were duly assigned by Elliot to the Consolidated Company (of New Jersey), that the Blue Bell Company executed and delivered a deed to the said Consolidated Company, and that "it is deemed advisable and necessary that the obligation of the Consolidated Company under said contract to make such further payments to the Blue Bell Company out of the net profits of said properties should be set forth in an agreement and form for record," and contains the following provision:

"Now, therefore, in consideration of the execution and delivery of said deed by the Blue Bell Company, and of the sum of one dollar ($1) paid by the Blue Bell Company to the Consolidated Company, the receipt whereof is hereby acknowledged, the Consolidated Company hereby agrees to pay, or cause to be paid, to the Blue Bell Company twenty-five per cent. of the net profits resulting from the operation of the said 'Blue Belle,' 'Blue Coat' and

'Blue Buck' patented mining claims, until the said Blue Bell Company shall have received the aggregate sum of one million dollars ($1,000,000). Said payments shall be made quarterly on the first days of January, April, July and October in each year, or as soon thereafter as the net profits for the preceding quarter can be conveniently ascertained. Such net profits shall be the net proceeds from the operation of the said mining properties, after deducting the cost of mining, necessary development work (but not including the purchase of new machinery), transportation, sampling, treatment and smelting, and plant superintendence, and all proper charges incidental thereto, but not including the rent payable under the lease of said mining properties, dated twenty-ninth December, 1905, to the Arizona Exploration Company.

"This agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto."

[1] Upon an examination of these two agreements, it appears that it is incorrect to say that the mines were sold for the sum of $1,000,- 000, or that in addition to the sum of $100,000 which was duly paid there was an agreement to pay a balance of the purchase price, amounting to $900,000. The covenant is to pay 25 per cent. of the net profits resulting from the operation of the said "Blue Belle," "Blue Coat," and "Blue Buck" patented mining claims, until the said Blue Bell Company shall have received the aggregate sum of $1,000,000.

This is an agreement for a share in the profits of mining operations. The payments are wholly contingent upon the success of these operations, and upon the earning of a profit, and are measured by the amount of profit. According to the success of the enterprise nothing may be payable, or any amount up to, but not exceeding the sum of $900,000, which is a maximum beyond which the right of the Blue Bell Company to share profits ceases. Before profits can be shared, the operating company is entitled to reimburse itself for the expense of development and of operation, and also for the expense of transportation, sampling, treatment, and smelting of ores, plant superintendence, and all proper charges incident thereto.

We must not lose sight of the very substantial difference between an agreement to pay $900,000 as an agreed value for land and an agreement to give a quarter share of profits, if there are profits, with a maximum of $900,000. The present worth at the date of the deed of such a prospective share or chance in a mining venture is wholly conjectural. The covenantor does not acknowledge that the present value of the mines which have been conveyed to it is by any specific sum more than the cash payment. In addition to a satisfactory purchase price, it gives a share in the venture. It is, however, erroneous to treat the present case as if the grantor had parted with a consideration of the value of $900,000 for which a debt of $900,000 was created.

The operation of the properties from which it is contemplated that a profit may result includes not merely the winning of ore, but also the transportation and smelting of ores and the sale of metals. The contract of September 15th provides that Elliot will procure to be executed by the Arizona Smelting Company, a corporation of the state of New Jersey, operating in Humboldt, Ariz., a contract for the smelting of all the ores produced from the said mining property for a

period of five years, substantially in the form marked "A," which provides for the terms on which ores and concentrates are to be smelted. The covenants of Elliot and of the New Jersey corporation, his assignee, contain no express terms binding the covenantor to operate or restricting or controlling the use of the properties conveyed, and seem to us to relate rather to a share of the profits of the business to be conducted by the covenantor than to the lands or mines themselves.

The parties contracted upon the supposition that the business would in fact be carried on; nevertheless, it does not appear that the grantee was willing to bind either itself or its assigns that it should be carried on. There is a clear distinction between the expectation of the parties and the duty imposed by the contract, and the court would not be justified in going farther than the expressions used in the contract. Maryland v. Railway Co., 22 Wall. 105, 112, 22 L. Ed. 713.

If from the agreement to share profits could be implied a further agreement to make reasonable efforts and reasonable expenditures for the development of the mines, this would be in its nature a personal agreement pure and simple. Ownership of mining land does not involve as a mere incident the ability to raise capital and to furnish machinery and labor for developing it.

If it can be said that these covenants "touch and concern the land" at all, it is but indirectly and partly. The covenants certainly do not wholly touch and concern the land, but relate immediately to a business to be conducted not only by the use of the mine, but by the use of personal property, and both on and off the land conveyed.

The contention that the contemplated profits will be the proceeds of the land, or issue out of the land, and that therefore an agreement concerning these profits concerns the land and runs with the land, involves a disregard of the proper scope of the terms of the agreement. What seems to us the error of this contention is made clear by the decision of the Supreme Court of the United States in the case of Stratton's Independence, Ltd., v. Howbert, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. Ed. ——. In that case it appears to have been argued that the proceeds of mining operations conducted by a mining corporation do not represent values created by or incident to the business activities of such a corporation, and therefore cannot be a bona fide measure of a tax levied at such corporate business activities; that the proceeds of mining operations result from a conversion of the capital represented by real estate into capital represented by cash, and are in no sense income. The court said, however:

"It is not correct, from either the theoretical or the practical standpoint, to say that a mining corporation is not engaged in business, but is merely occupied in converting its capital assets from one form into another. The sale outright of a mining property might be fairly described as a mere conversion of the capital from land into money. But when a company is digging pits, sinking shafts, tunneling, drifting, stoping, drilling, blasting, and hoisting ores, it is employing capital and labor in transmuting a part of the realty into personalty, and putting it into marketable form. The very process of mining is, in a sense, equivalent in its results to a manufacturing process. And, however the operation shall be described, the transaction is indubitably 'business' within the fair meaning of the act of 1909; and the gains derived from it are properly and strictly the income from that business; for 'income'

may be defined as the gain derived from capital, from labor, or from both combined, and here we have combined operations of capital and labor."

The error of attributing to the mine itself the entire profits of mining operations is sufficiently pointed out in that opinion. The observation that "the very process of mining is, in a sense, equivalent in its results to a manufacturing process," has a special application to the contemplated operations in the present case, which included not alone the winning of ore, but the production of metals from ore, and a profit from what is "rather a manufacture of art and labor result-ing from the use and application of minerals" than proceeds of the realty. See King v. Pomfret, 2 M. & S. 139, 143; Burdick v. Dillon, (C. C. A. First Circuit) 144 Fed. 737, 741, 75 C. C. A. 603; In re Chandler, 1 Lowell, 478, 479, Fed. Cas. No. 2,591.

The uncertainty of the obligation is a strong indication that no present lien or security on the land was intended. If the parties understood they were merely to share profits, and profits were dependent upon success, it was natural not to contract for security.

The chief reliance of the complainant is the provision in the agreement of November 15th:

"This agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto."

It is argued that this shows an intention that one who should succeed the covenantor in the title to the mines should assume the obligation of paying a quarter of the net profits from their operation, and also that this shows an intention that the land should stand as security for the payment of the quarter share of profits.

This provision contemplates a succession or substitution of parties by the voluntary act of either of the contracting parties. We think, however, that no intention to enlarge the previous terms of the agreement can be deduced from it.

As the original covenantor has not expressly agreed that it will not alienate or incumber the land, and has not restricted its use, and has not expressly agreed that the land should stand as a security for the performance of the covenant, we are of the opinion that a voluntary conveyance of the mine by the original grantee, while it might have defeated the expectation of the grantor, would not have violated any right of contract and would not have released the covenantor from its personal obligations.

Successors and assigns were to be bound only as the original covenantor was bound, and it was contemplated that one who should succeed through voluntary assignment from the covenantor to the business from which the profit was to result should be placed in the same contractual relations as to that business.

The appellant is not in the proper sense a successor and assign of the bankrupt corporation so as to become, as its representative, substituted generally upon its obligations. It has merely succeeded in the title to a portion of the bankrupt's assets. It is by no means evident that it was intended that one to whom the mines alone might be leased or sold should be required to assume any obligation to the complain-

ant. Both Elliot and the bankrupt corporation agreed "to pay or cause to be paid" 25 per cent. of the net profits resulting from the operation of the said properties. This is not confined to operations conducted by any particular person. Alienation is not expressly prohibited, and in fact seems to be contemplated, and would not defeat the personal obligation of the covenantor.

The contract, having regard both to its express terms and to its nature, is one that is capable of performance by the original covenantor, although it may have leased or sold the mines for others to operate, and is one not capable of performance merely because of ownership of the mines.

The argument that because successors and assigns are to be bound as the original covenantor is bound, therefore the original covenantor has agreed that the land while in its hands shall be security for the performance of the personal covenant, seems unconvincing. We cannot infer from a provision for a substitution of parties to the contract an intention to enlarge the obligation of the original covenantor or to impose a burden on the land.

The use of this conventional phrase concerning successors and assigns is of slight significance, since that part of the agreement specifically setting forth the obligation to make payments makes no provision that the land is bound as a security. This phrase would be quite as appropriate in an agreement between two corporations touching a business entirely disconnected from the land as in an agreement relating only to land. It does not savor of the realty more than of personalty, and therefore does not prove an intention to charge the land as a security. It may be given the same significance as in an agreement concerning personalty or services.

The common sense of the matter is that if it had been intended to charge the land while in the covenantor's possession the lawyers who drew the agreement would have provided for this in plain language, and would not have left it to depend upon a doubtful inference from a clause whose purpose was not to state the terms of agreement, but merely to provide for substitution of parties.

Furthermore, it is very doubtful if in this contract we can interpret the words "successors and assigns" as including other than voluntary assigns, or as having any application when the bankrupt's estate passes by operation of law. Gazlay v. Williams, 210 U. S. 41, 28 Sup. Ct. 687, 52 L. Ed. 950.

In accepting as part consideration a contract for a share of profits from an enterprise which involved the investment of large capital in machinery and labor, and was not confined to the winning of ore, but included its reduction to metal at the expense of the operator, the grantor relied rather upon its hopes or upon its confidence in the ability of the grantee to furnish the necessary capital and to successfully develop the mine, and upon its interest in so doing, than upon any security afforded by the mine itself. It is difficult to so interpret these documents as to find an intention that the grantee should charge its land as security for the success of its own mining venture or the venture of successors in title who might be able to furnish further cap-

ital and conduct, under new superintendence, additional mining operations. It is equally difficult to infer such intention from the documents interpreted in the light of the circumstances. The grantee was vested with a full record title (a marketable title) to the mines. The grantor deliberately made choice between giving a deed conferring such title and a deed showing on its face a reservation of rights. It expressly elected not to reserve rights in the deed, and to withhold from record agreements containing the covenants upon which the present complainant now relies.

While the New Jersey corporation was operating the mines, it expended very large sums of money, and, while it was the owner of an unqualified title, it obtained loans from various bankers aggregating upwards of $740,000. Having a share in the profits of the mining venture to an amount which was doubtless much larger than the purchaser would have agreed to pay in cash, it was for the interest of the grantor, as well as of the grantee, that the grantee should have the means of borrowing, and this was inconsistent with a lien. In re Brentwood Brick & Coal Co., 4 Ch. D. 562, 565.

The defendant contends that the deliberate withholding of the agreement from record and giving to the New Jersey Company the credit of being the owner of an unqualified title estopped the Blue Bell Company from setting up the agreement as against creditors.

Without now considering the question of estoppel, we think these facts may be legitimately considered as showing that there was no intention to charge the land as a security, and that it was for the mutual interest of the parties interested in the success of the mining venture that the land should stand unencumbered in order that the business of operating the mines, to which in terms the covenant relates, might be developed with capital acquired on the faith that the true ownership was the record ownership.

We should prefer to find that the grantor intended to take no security rather than that it intended to aid the development of the mines by holding out the grantee as owner while it was borrowing money for development and to first disclose a claim for security after the public had advanced its monies. As was said by Chief Justice Marshall, in Bayley v. Greenleaf, 7 Wheat. 46, 51 (5 L. Ed. 393) concerning a vendor's lien:

"A vendor relying upon this lien ought to reduce it to a mortgage, so as to give notice of it to the world. If he does not, he is, in some degree, accessary to the fraud committed on the public, by an act which exhibits the vendee as the complete owner of an estate on which he claims a secret lien."

The defendant cites many cases, among them Jackson Brick & Tile Co. (D. C.) 189 Fed. 636, 649; and In re Bothe, 173 Fed. 597, 97 C. C. A. 547, to support its contention that there is estoppel.

We find it unnecessary, however, to consider at length the questions of estoppel and constructive fraud, though these are important, for we are of the opinion that upon the terms of these documents interpreted both literally and in the light of circumstances we must find that there is no sufficient evidence of an intention to create a security.

We have also to consider what seems a somewhat artificial argument

based upon implications and fictions from the ancient and technical law of real estate, whereby it is sought to charge the appellant as by a covenant at law running with the land.

In order that a covenant may run with the land, it must "touch and concern" the land.

This covenant as to its benefits to the covenantee is entirely personal; it benefits no lands of the grantor. As to its burdens, the land of the covenantor is not subjected to any restriction nor limitation as to use or mode of occupation, and no active duties are expressly imposed upon the covenantor to develop or operate the mines.

To show that the covenant "touches and concerns" the land, the complainant, appellee, argues as follows:

The complainant is vested with the title to a royalty; a payment of a royalty out of the profits of land is rent; a covenant in a lease to pay rent touches and concerns land, because rent is regarded as something rendered for the possession of land. If a covenant to pay money rent touches and concerns the land, a fortiori this covenant touches and concerns the land.

This argument seems in some particulars misleading. It is an historical fiction that rent issues out of land. Holmes, Common Law, 388, 391. But it will hardly be contended that purchase money to be paid for land issues out of land or is rent.

If rent be regarded as something rendered for the possession of land, it does not follow that what is rendered for the title to land is rent, though this seems to be implied in appellee's argument. In a vague sense both purchase money and rent may be said to be rendered for the possession of land; but this does not make them so identical that the fiction which attaches to rent must also attach to agreed purchase money, or to an additional sum conditionally payable for the same consideration for which the defined purchase money was paid.

Furthermore, the proposition that a payment of a royalty out of the profits of land is rent seems both inexact and inapplicable. Rent may assume the form of a royalty, or be determined in amount by a royalty; but a covenant to share the profits of land does not necessarily create a rent. Here, however, as we have seen, the covenant was not to share the profits of land, but of operations which the parties treated as the source of profit rather than the land.

Nor can we accept the statement that the complainant has the title to a royalty in the sense in which the term is ordinarily used. The typical illustration of a royalty is a fixed sum per ton for ore mined, or a fixed sum per patented article manufactured, used or sold. Where a royalty is agreed upon there is a contract as to value per unit, which affords a definite basis for computing proportionately to use a sum which may become due for the acquisition or use of a number of units.

An agreement for a royalty upon each ton of ore might possibly be said to touch and concern the land, not because it is in the nature of rent, but because the ore itself in place is part of the realty, and payment to the landowner for the ore per ton as removed is payment for precisely what comes out of the ground. When, however, the contract is not for a price for ore taken out, but for a share of the profits from

the operator's business of developing three different mines, the profits of one of which may be required to meet the losses of another, then the payments cease to be proportionate to the parts of the realty removed from place.

The appellee's proposition that "an obligation to pay the value of twenty-five per cent. of the ore taken out of the land touches and concerns the land" erroneously interprets the covenant.

With a typical royalty the grantor's income is computed upon the ore itself; in this case such computation is impossible, for what is to be shared is the profit of the operator from dealings with the ore, and products of the ore, as personalty, after deducting the expenses of excavating and all other expenses incident to dealing with the ore as personalty.

The nature of the ore in place, and considered as a part of the realty, is, of course, an important factor; but the ore when brought to the surface, severed from the realty, is the proceeds not of land alone, but of capital and labor as well, and as it is transported, smelted, and its metals extracted the whole operation is more and more characterized by its business features rather than by the character of the raw material in place as a part of the realty.

While the term "royalty" is sometimes used in a loose sense to denote merely a share, yet upon the question before us it tends to error, and is much less accurate than the expression used by the parties to express their intention—"twenty-five per cent. of the net profits resulting from the operation."

In seeking for the actual intention of the parties we must give their language a natural interpretation, and cannot attribute to them an understanding that a share of profits of a business is a royalty; that a royalty is a rent; that rent by legal fiction issues out of land; and that by like fiction the profits of the business of mining issues solely out of land, or is to be regarded as the proceeds of land because it is to be rendered for the title to land.

The appellee also proposes as a test the following:

"Where the nature of the covenant is such that naturally it can only be performed by the owner of the land, the covenant is one which touches and concerns the land, and therefore one which binds the successive assignees of the land."

This general proposition is not supported by authority, and we think it unsound. It does not follow because a covenant touches and concerns the owner of land that it touches and concerns the land itself. It is not enough that a covenant is to be performed by him who owns the land; it must affect the mode of occupation or enjoyment of the land. Nor is mere intention that a covenant shall run enough to make a covenant touch and concern the land. This must be determined from the subject-matter. It must be "capable in its own nature" of running with the land. 1 Smith's L. C. (7th Am. Ed.) pp. 217, 221, 226, 190, 191; Sims on Real Covenants, 115. The error of the appellee's proposition is pointed out, and well illustrated, in the appellant's brief in reply.

The learned counsel for the appellee have failed, we think, to find any case that supports its contention that a covenant like that before us creates at law an obligation which attaches to those who succeed to the title of the covenantor.

The appellant cites the following cases to support its contention that the covenant does not touch or concern the land, and that the use of the word "assigns," however clearly it may show an intention that the agreement should run with the land, is insufficient to accomplish this, or to make the covenant touch or concern the land: Mygatt v. Coe, 147 N. Y. 456, 467, 42 N. E. 17; Brewer v. Marshall, 18 N. J. Eq. 337, 341; Wilmurt v. McGrane, 16 App. Div. 412, 417, 45 N. Y. Supp. 32; American Strawboard Co. v. Haldeman Paper Co., 83 Fed. 619, 625, 27 C. C. A. 634; Kettle River Railroad Co. v. Eastern Railway Co. of Minnesota, 41 Minn. 461, 471, 43 N. W. 469, 6 L. R. A. 111; Rogers v. Hosegood, 2 Ch. D. 388, 395; Keppel v. Bailey, 2 Myl. & Keen, 517, 537; Reid v. McCrum, 91 N. Y. 412, 417, 418; Wells v. Benton, 108 Ind. 585, 8 N. E. 444, 9 N. E. 601; Glenn v. Canby, 24 Md. 127, 130, 131; Clement v. Willett, 105 Minn. 267, 270, 117 N. W. 491, 17 L. R. A. (N. S.) 1094, 127 Am. St. Rep. 562, 15 Ann. Cas. 1053; Scholten v. Barber, 217 Ill. 148, 75 N. E. 460; Dolph v. White, 12 N. Y. 296, 301, 302; Dickey v. Kansas City, etc., Railway Co., 122 Mo. 223, 231, 26 S. W. 685.

We think the true view of this covenant is that it does not touch or concern the land, but does concern a personal business. Mr. Sims, in his book on Real Covenants, at page 109 et seq., refers to this topic, and collects the decisions. But even should it be found that this covenant does in fact touch and concern the land, there would still remain the question whether in any event the burden of the covenant can run so as to charge the assigns of the covenantor.

The real contention of the complainant in this case appears to be, not that the covenant runs with the land, but that the covenant of the bankrupt runs with the business of the appellant.

It seems to be well settled in England that a covenant of the character of that now before us does not run with the land, and is not enforceable at law or in equity in such a way as to require a successor in title to the covenantor, who has entered into no covenant, to expend sums of money in accordance with what the original covenantor bound himself to do. In the following cases are valuable statements of the effect of the English cases upon these topics: Hayward v. Brunswick Building Society, 8 Q. B. D. 403; Austerberry v. Oldham, 29 Ch. D. 750. The latter case is cited on the appellee's brief to the effect that it is now settled in England that the burden of covenants will not run where there is no tenure; that is, where there is no reversion. The case, however, seems to have a much broader bearing.

Mr. Sims, in "Sims on Real Covenants," p. 148, says that the weight of American decisions seems to follow the contrary view. It should be noticed, however, that Mr. Sims, in his definition of a covenant which runs with the land, observes that the principle is the linking of properties together, so as to make one piece more useful by the obligation of the owner of the other. Sims on Real Covenants, 17, 19. In a note.

page 17, he states that the definition may cover incorporeal as well as corporeal hereditaments, and the appellee here argues that it has an incorporeal hereditament. We are, however, unable to accept the contention that the right to these conditional payments out of the profits of operation is an incorporeal hereditament.

In view of our opinion that the covenant does not run because it does not meet the primary requirement that such a covenant shall touch and concern the land, we need not further consider the question of the running of the burden of a covenant with a fee estate. We may observe, however, that no case has been cited to show that under the law of Arizona, where the land is situated, the burden of a covenant can run with a fee estate.

[2] In the District Court the question whether the covenant ran with the land was not decided, but the case was determined for the complainant on the ground that an equitable charge existed even if the covenant did not run with the land.

We are unable to see any ground upon which a court of equity can charge the appellant unless there was a legal covenant which ran with the land, or an agreement expressly charging the land. Equity cannot intervene on the ground of a vendor's lien for an unpaid purchase price.

By the law of Arizona (where the land is situated), as stated in Baker v. Fleming, 6 Ariz. 418, 59 Pac. 101, 2 Ann. Cas. 370, there is no implied lien for unpaid purchase money. In other words, the creature of equity, known as a vendor's equitable lien, which is based upon the fact that the purchaser has not paid for what he has received, does not exist in Arizona and is regarded as contrary to the policy of that state. This is conceded by the appellee, who contends that this decision is inapplicable, because in the present case we have an express lien; but, as no lien exists merely because there is an unpaid purchase price, or unpaid consideration, it necessarily follows that no lien arises either at law or in equity from the mere fact that there is a document in writing evidencing the agreement to pay a further price or consideration. To create such a lien there must be something more than a declaration that the purchase money to a certain amounts remains unpaid; the amount must be expressly charged upon the land. Hiester v. Green, 48 Pa. 96, 86 Am. Dec. 569; Jones on Liens, vol. 2, § 110.

[3] We must give due effect to the decision in Baker v. Fleming, and this precludes us from raising upon equitable principles a charge for which the parties have not contracted.

The case of Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865, emphasizes the requirement of an agreement showing an intention to create a lien, charge or security.

The parties contracted not for security, for there was no fixed obligation to secure, but for a share in a fund that never was created, and. for whose creation the contract itself can no longer avail.

It would establish a most dangerous rule of property were land to be charged with liens or in effect mortgaged by an instrument containing not a single definite expression of such intent.

But even were we to adopt the complainant's contention that it was intended that the land itself should be a security for the performance of the contract, we should still have to inquire whether in view of the bankruptcy and of the rights of the bankrupt under the contract that security was of any actual value. In other words whether the value of the land as a security was not exhausted by rights of the bankrupt to which the trustee in bankruptcy succeeded.

December 4, 1907, a petition was filed upon which, on April 27, 1908, there was an adjudication of bankruptcy. Its effect was to defeat the mining operations of the bankrupt and to destroy its ability to carry out the contract. If it be true that there was a contract for security, then the grantor could look only to the land itself, as it then stood, for such security; but the contract by its terms clearly created no present debt, and nothing was then due from the bankrupt. Therefore it was then impossible to prove any definite pecuniary charge against the land. Had the land been sold by the bankruptcy court, free from liens, with liens transferred to proceeds, complainant would have been unable to prove a definite pecuniary value, if any, of its right to a share of the profits.

The complainant could not derive from the bankrupt what was essential in addition to the mines to carry out the terms of the contract, and obviously could not expect a stranger to do so without consideration.

The personal assets of the bankrupt became immediately available for the payment of its creditors. If, as the complainant suggests, a trust was imposed which went with all successors in title to the land, it was an active trust that could not have been executed by sale of the land, but required the operation of the mines, in order to create the funds in which complainant was to share, and a trust that after the bankruptcy necessarily must have been carried out with funds supplied by the complainant, or raised upon the land itself. If by any possibility a receiver or trustee could have been appointed to carry out the supposed trust with funds so raised, then, after paying interest on the new funds supplied for development and a suitable compensation for the services of a receiver or trustee, if a profit resulted it would be first wholly applicable to the reimbursement of the bankrupt or its estate for all the charges for development and operation of the property, including transportation, sampling, treatment, and smelting, plant superintendence, etc., which were apparently some three-quarters of a million dollars. After such payment the complainant might have one-quarter of the profits, three-quarters going to the bankrupt's estate, until the complainant had received $900,000, after which the entire property would be reconveyed to the bankrupt's estate.

As we understand the effect of the decree appealed from, it is that the purchaser of the mines at the bankruptcy sale is in equity bound to assume all of the obligations of the bankrupt under the contract, and, irrespective of the value of the land which it purchased, to furnish its capital and services as a voluntary successor to this obligation of the bankrupt as a condition of doing business.

Under the direction of the bankruptcy court, the mining property was put up at public auction, and, without notice of any claim that there was a charge upon the land or upon the profits of operation, it was sold, with other property, for the amount of the highest bid, $200,000—presumably a fair price. In any event, after making all due allowances, this is a strong indication that the value of the security subject to the prior charges for reimbursement was of no substantial amount.

Subsequent to its sale at public auction, and before paying over to the trustee in bankruptcy the amount of the bid, the purchaser had notice which, for present purposes only, we may assume to be sufficient notice of the agreements of September 15 and November 15, 1906. After such notice counsel for the purchaser made an examination of the law of Arizona, and especially of the case of Baker v. Fleming, 6 Ariz. 418, 59 Pac. 101, 2 Ann. Cas. 370, which holds that the equitable doctrine of a vendor's lien for unpaid purchase money has no application in that state.

The purchase price as fixed, before notice, at the sale by the trustee in bankruptcy was paid over despite the notice. The purchaser and the appellant, however, have from the first consistently refused to recognize or be bound by the contract of the bankrupt. So far as the title to the real estate is concerned, they may be so affected by notice as to make irrelevant the fact that the instrument had not been recorded. We may assume that they took the bankrupt's actual title as distinguished from the record title. To hold, however, that their acts and conduct have been such as to amount to a voluntary adoption of a contract which they have always consistently contended did not bind the land, and was of no legal effect against them, would be a grave injustice and a perversion of the rule that one who is not an original party to a contract may become such by voluntary adoption, and that such voluntary adoption may appear from acts and conduct as well as from express verbal agreement.

The case of Wiggins Ferry Co. v. Ohio & Mississippi Railway Co., 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055, cited in the opinion of the District Court, though not cited upon appellee's brief and apparently not now relied upon, turns upon the voluntary adoption of a contract by conduct which was found only consistent with its adoption. The conduct of the appellants and their predecessor in title is consistent only with their repudiation of the contract.

By taking the land it is very clear that they assumed no legal, equitable, or moral obligation to advance new money and make new efforts for the benefit of the grantor; and a court of equity cannot justly appropriate values derived from the development of the mines through business activities and capital not derived from the bankrupt.

[4] It is true that the trustee in bankruptcy took the property with all the equities impressed upon it by the bankrupt, but it is likewise true that we must consider the equities from both sides, and not from the side of the complainant alone. The trustee takes with the equities in the bankrupt's favor as well as with the equities against him.

After its very large expenditure we think that the bankrupt itself

might have elected to cease its investment of capital and its business efforts without breach of any express or implied covenant. Regarded as a personal covenant, it was practically discharged by full performance by the bankrupt of all duties implied in it. No new personal obligation of a purchaser could exceed the original obligation of the bankrupt.

According to the complainant's view there has been attached to this land for an indefinite period (perhaps in perpetuity) an obligation which attaches as a condition of doing business to all persons succeeding the bankrupt in title and to the proceeds of their new capital and business activities. But this disregards the rights of the bankrupt under the contract. If, following the complainant's argument, we ignore the personal character of the covenant and say that it relates to the proceeds of land, and therefore to the land, then it follows, as both covenantor and covenantee are to have rights in the proceeds, that the land represents not only the grantor's share of profits, but the bankrupt's right to reimbursement. The right of the covenantor to all the proceeds of the land until repaid the amount expended in development and working is primary, and should it exhaust the value of the land as a security at the time of the bankruptcy the complainant stands merely in the plight of a second mortgagee when a first mortgage is foreclosed and brings less than the amount of the debt.

We fail to see the application to this case of the doctrine of Legard v. Hodges, 3 Bro. C. C. 531, 4 Bro. C. C. 421, in which the covenantor, having bound himself to pay a certain sum, covenanted to set apart and appropriate one-third part of the clear yearly rents arising from several estates until such sum was paid. This created a debt with a contract to appropriate the rents to pay it, and was held to impose a trust upon the land which bound purchasers with notice—a trust which could be administered through a receiver.

The difficulty in the complainant's case is that the grantor took in addition to a satisfactory purchase price merely a chance in a mining venture, and took no security that this venture should last longer than the ability or interest of the coadventurer, the bankrupt.

As was said by the Circuit Court of Appeals for the Ninth Circuit, in Synnott v. Tombstone Consolidated Mines Company, 208 Fed. 251, 125 C. C. A. 451:

"Manifestly there could be no lien to secure something for which no liability existed. The case showing that there never were any surplus earnings of the company, and that as a consequence, the funds out of which the instruments" were alone "payable were never created," etc.

The case of Portland Chemical & Phosphate Co. v. Blodgett, 152 Fed. 929, 82 C. C. A. 77, is said by the appellee to be on all fours with the present case. That case, however, is in very substantial particulars different from the present case. There was an express agreement for the purchase price of $100,000; there was an agreement that the balance of the purchase money should be paid by a royalty per ton; there was an agreement binding the purchaser to operation, and especially an agreement in terms prohibiting the conveyance or in-

cumbrance of the land until the full amount should be paid. The effect of this was expressly to charge the land with a fixed and agreed purchase price. The case is of no value as an authority in the present case, except as it well illustrates by contrast the deficiencies of the complainant's contracts.

There are in the case many other important questions, some affecting the complainant's rights under the assignment by the Blue Bell Company of proportional shares of the prospective profits and their reassignment to the present complainant.

The question of estoppel by failure to record the instruments while the bankrupt corporation was borrowing large sums from bankers, and was employing such sums for an enterprise in whose profit the Blue Bell Company and the bankrupt were both interested, is a very serious question, as is also the question of the equitable status of this complainant as against creditors who advanced their money for the development of the mines, and succeeded to the bankrupt corporation's right of reimbursement, and who are now, through reorganization proceedings, interested as stockholders in the Maine corporation, the defendant.

Without determining these questions, we prefer to rest our conclusion upon the ground that the contracts referred to create no legal or equitable charge upon the land or upon the defendant corporation, the appellant.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to enter a decree dismissing the bill with costs; and the appellant recovers its costs of appeal.

ALDRICH, District Judge (dissenting). It seems to me that this case discloses a plain equity in the appellee.

The majority opinion proceeds upon the idea that the agreements do not disclose any definite purchase price; that there was no actual agreement or liability beyond the payment of the $10,000 and the $90,000; and that the transaction does not disclose an intention to bind an interest in the land, or to touch 25 per cent. of the net profits as security for the remaining $900,000.

If the provision, in the agreement of September 15, 1906, which declares that "this agreement shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns," which was reiterated in the final agreement of November 15th, was not intended as security through touching 25 per cent. of the product of the mine after deducting expenses of mining, etc., to what possible end could it have been used? It did not express the idea that profits in a business are a technical royalty, or that royalty is rent. It did, however, plainly and unmistakably express the idea that the grantor should hold to himself 25 per cent. of the ore product, less operating and other contemplated incidental expenses, until the aggregate sum of $1,000,000 is received, and that the agreement is binding upon successors and assigns. If, as said by Mr. Justice Holmes, in Barnes v. Alexander, 232 U. S. 117, 34 Sup. Ct. 276, 58 L. Ed. ——, decided January 12, 1914, we are to start "with the principle that an informal

business transaction should be construed as adopting whatever form, consistent with the facts, is most fitted to reach the result seemingly desired," there is no difficulty whatever in reaching the conclusion that the parties intended security. It is obvious that there could be no security unless the agreement touched the mine itself. It is quite true that the profits and the security were contingent upon operations and contingent upon success; but these contingencies were obviously contemplated, as was the contingency of success in the contingent fee case with which the Supreme Court was dealing in the opinion just quoted.

It is perfectly true, and there is no contention against the idea, that the agreement of September 15th, and that of November 15th as well, contemplated business operations, and that the business of mining and preparing the product under the terms of the agreement was left altogether to the grantee and its successors, the situation to be subject, of course, to such considerations of good faith as the relations established by the agreement might require.

It is impossible for me to see that the case of Stratton's Independence, Limited, v. Howbert, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. Ed. ——, decided December 1, 1913, which related to the question whether the gains of a mining operation were the income of a business within the meaning of the act of 1909, has any application whatever to the questions or the principles involved in the case at hand, while the reasoning in the case of Barnes v. Alexander, which related to a contingent fee, with eyes toward the future and to the division of fruits if and when they should be received, is very close to the question which we are now considering.

The case at bar was decided by the District Court for the District of Maine in August, 1912, and the decision and the reasons for it were stated in an elaborate and well-considered opinion, which is reported in 198 Fed. 907. The opinion of Judge Hale contains a careful and comprehensive history of the titles in question, the issues raised by the pleadings, and the questions of law and fact involved; and there is no occasion for restating them here.

The properties to which the rights in question relate consisted of copper mines and mining rights situated in Arizona, and known as the Blue Bell Mines. The mines were sold for $1,000,000, and were conveyed by deed executed in connection with certain agreements as to the purchase price.

There were two agreements in connection with the transaction, one on September 15, 1906, which stated the terms of the bargain or agreement of sale between the Arizona Blue Bell Company and one John L. Elliot and the terms of the contemplated conveyance. Upon the execution of this agreement $10,000 of the purchase price was paid. This agreement and the rights under it were subsequently assigned to the New Jersey Consolidated Arizona Smelting Company.

On November 15, 1906, in conformity with and in furtherance of the agreement of September 15th, the Arizona Blue Bell Company conveyed to the New Jersey Consolidated Arizona Smelting Company. At the time the deed was delivered, the $90,000 which was stipulated

for by the agreement of September 15th was paid by the grantee. On the same day—that is to say, November 15th—and as a part of the transaction involved in the execution and delivery of the deed, the grantee executed a written agreement to the grantor which, in conformity with and in furtherance of the agreement of September 15th, provided for the payment of the remaining $900,000 out of the net earnings of the properties. The agreement was not recited in the deed, nor was it referred to, but in express terms it was made binding upon the respective parties, their successors and assigns, and its benefits under express terms were to inure accordingly.

The fair import of the agreement is that the sale was for $1,000,-000. The $10,000 and the $90,000 were definitely described as advance payments. The agreement of September 15th recites that the Blue Bell Company agrees to sell and Mr. Elliot agrees to purchase, etc., the price to be paid by Mr. Elliot for the properties to be the sum of $100,000, $10,000 of which was to be paid when the agreement was signed, and the remaining $90,000 upon delivery of the deeds; and there is a further covenant and agreement to pay, or cause to be paid, to the Blue Bell Company, until it shall have received the aggregate sum of $1,000,000, 25 per cent. of the net profits. The agreement of November 15th recites that the consideration is $100,-000 in cash and the payment to the Blue Bell Company of 25 per cent. of the net profits resulting from the operation of the mining properties until the Blue Bell Company shall have received the aggregate sum of $1,000,000. Again, it is provided that, in consideration of the execution and delivery of the deed, the Consolidated Company agrees to pay, or cause to be paid, 25 per cent. of the net profits resulting from operations until the Blue Bell Company shall have received the aggregate sum of $1,000,000, and that such payments shall be made quarterly. It is, of course, true that the right of the grantor, or its successors, to receive the $900,000 was contingent upon success of operations to be carried on under the relations which were created by the agreements. This was something contemplated by the parties at the time they made the trade and created the security.

The questions are:

First, whether the agreement for the payment of the purchase price from the net earnings of the mining properties constitutes a covenant at law which runs with the land, with or without regard to the question of notice; and,

Second, if not technically that, whether it becomes a charge upon the land which will be enforced in equity against parties holding with notice.

It must be borne in mind as a leading and quite controlling consideration that the values involved were not in any substantial measure based upon the land in the sense in which land values are popularly and generally accepted, but upon an inherent product of the land whose value and availability were dependent upon working and mining operations. Indeed, the agreement of November 15th recites that the quarterly payments are to be made from the net profits of the

preceding quarter, and that the profits shall be calculated upon the net proceeds of the operations of the mining properties. It is difficult to conceive of a situation which would more clearly warrant a conclusion that the right sought to be established by the agreement touched and concerned the land, because the right had reference to an imbedded and hidden resource whose value depends upon operating development, every phase of the right being thus incident to and consequent upon the right of possession and control. An agreement of this character touches and concerns the land, because it is primarily founded upon and attaches to the product which is the sole or principal element of value therein. A question of this kind is largely controlled by the nature and character of the property and the intention of the parties.

The nature of the interest covered by the agreement in this case is apparently such as to bring the covenants unquestionably within that class of cases which hold the most restricted view as to covenants which touch the land. From the very nature of the interest and the character of the right sought to be established, the covenants, if they were to be at all potential, necessarily attached to an undeveloped product which must, if anything did so, produce the profit out of which the purchase payments were to be made, and whether profits were to be realized was necessarily dependent upon possession and development. It touched an interest which, as expressed in Camp v. Boyd, 229 U. S. 530, 558, 33 Sup. Ct. 785, 57 L. Ed. 1317, in speaking of "ground rents," represented a part of "the substantial fruits," and "the entire fruits, of ownership."

The interest and the right in question necessarily inhered in and attached to the land, or, to be more exact in a situation like this, it attached to the inherent fruit which was the chief element of the land value. It is palpable that the parties intended that the agreement should touch the land and its imbedded product, because by express terms, it was stipulated that "such net profits shall be the net proceeds from the operation of the said mining properties, after deducting the cost of mining, necessary development work," etc., and because, by the express terms of the agreement, the rights thereunder were to inure to the benefit of successors and assigns, and its burdens were to rest upon successors and assigns.

While the appellant contends that the terms of this agreement do not touch and concern the land, it is apparent that its chief contention is based upon the idea that, if the terms of the agreement do touch, they do not run with the land, because there is no reversionary right in the grantor. Upon this question whether an interest which so essentially inheres as this does in the sole element of undeveloped land resource is dependent upon a reversionary interest in the grantor, and upon the question whether privity of estate means tenure, or easement, or succession to title, the briefs and the arguments present an interesting and valuable discussion of the English and American cases, with the result of apparent demonstration that, if the question whether the covenant runs is contingent upon the existence of a reversionary right, the contingency is not founded upon reason, and,

if applied to a situation like this, that the denial of a meritorious right would be based upon grounds of fiction, rather than upon grounds of reason.

If persuaded, however, that the potentiality of covenants, which cut so deeply into an inherent land resource as these do, should not be made contingent upon a technical reversionary interest, still there might well be hesitancy in placing the decision upon that ground, because it is with reluctance that courts seize upon difficult questions— questions confronted with confused conditions under the authorities and with divergent reasonings of varying weight; and it is only when a determination of such controverted questions is necessary for the decision of the case that they are inclined to assume the responsibility of attempting a proper solution. Such a necessity does not exist here, because the second position of the appellee, which is, that even if the covenant does not run technically at law it creates a charge or a burden upon the land which should be enforced in equity against a purchaser with notice, presents an adequate ground for establishing and enforcing the rights of the covenantee.

This case is one of equitable cognizance, because it is for an accounting and an injunction, and under a familiar rule that when equity assumes jurisdiction for any purpose with respect to a given subject relief will be granted with respect to all questions between the parties relating to the same situation, the complainant has an adequate and complete remedy in equity. Thus, it follows that this case is not at all embarrassed by the rule which exists in some jurisdictions, subject to many exceptions, that courts of equity will not deal with questions of covenant where they run at law. Therefore the establishment of this right, upon the ground that the covenant operates as an equitable charge upon the land, is not at all dependent upon the question whether the covenant does or does not technically run at law, and, even if the question whether the covenant technically runs at law is to remain undetermined, still the views already expressed in respect to the nature of the property covered by the agreement, and the sense in which the agreement attaches itself to the inherent property value, are pertinent upon the question involved in the proposition that the agreement becomes an equitable charge enforceable against parties having notice.

The opinion of the District Court deals with the agreement in respect to future payments, as though it involved a royalty. This is perhaps not strictly true; but, as the payments are necessarily involved in the operation of development and use, and as they are based upon a certain percentage of the benefits, the obligations are in a very considerable sense like those with respect to royalties. Indeed, the covenants relate to an interest so inherent in the land resource as to bring them nearly if not quite within the requirements of the more exacting rules which obtain under the principles governing the subject of ground rents.

The propositions that the nature of the property is such as to make the undertakings and obligations nearly if not quite like those in respect to expressed royalties; and such as to bring the right nearly if

not quite within the principles which govern that class of rights involved in "ground rents"; that the agreement relates to a property interest so inherent in the land as to make the undertakings and obligations correspond with the undertakings and obligations which obtain in respect to covenants which run at law with land, unless defeated by a possible technical or fictional rule in respect to reversion—involve considerations which bear upon the question whether the agreement at issue should be accepted as one which constitutes a charge or burden upon the land which equity will enforce as against a successor in title with notice.

The exigencies of this case do not require an analysis and reconciliation of the decisions in this country and England since Legard v. Hodges, 3 Brown's Chancery, 531, and Tulk v. Moxhay, 2 Phillips, 774, upon the subject of covenants which do or do not run at law; in respect to equitable relief and its scope; under what circumstances enforceable; and why in some jurisdictions it is afforded only in respect to restrictive covenants or agreements.

While there has been diversity of reasoning and of authorities upon the general question as to what constitutes an equitable charge upon land, and as to the application of the equitable doctrine to particular cases, it may now, at least, be accepted as settled and established by the weight of judicial authority that where an agreement covers interests which inhere in the land, and particularly in situations where the interest covered by the agreement depends upon something to be produced from the land, where the agreement is executed for the purpose of securing the purchase price, and where it is clear that the intention was to bind successors and assigns, that the land itself will be affected by an equitable burden or charge enforceable in equity upon proceedings for an accounting against purchasers with notice.

It is not understood that the wide American discussion, and the very considerable diversity of judicial opinion in respect to the subject of implied equitable liens and implied equitable charges, nor the case of Baker v. Fleming, 6 Ariz. 418, 59 Pac. 101, 2 Ann. Cas. 370, which deals only with the question of implied equitable liens, has any application whatever to a situation in which the charge or security is sought to be established under a distinct express agreement in respect to an unpaid purchase price, and upon notice to the parties against whom remedy is sought.

It would seem that, without much regard for particular words or particular form, express agreements which relate to values inherent in land, and which are executed for the purpose of securing the payment of the purchase price, where the intention of the parties is plain, have generally been accepted in situations where covenants do not technically run at law as creating an equitable charge. This proposition is sustained by text-writers and by numerous authorities, which it is not necessary to review. Upon the question as to the existence and effectiveness of such a rule in a proper situation, it is deemed sufficient to refer to the case of Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865, and the authorities cited in support of the following paragraphs as to notice.

Now, as to notice to the appellant, the Consolidated Arizona Smelting Company of Maine (not the Arizona Smelting Company of New Jersey), which holds its title as a purchaser at a bankrupt sale.

The question in respect to notice is doubtless one of law and fact, and the court below held and found that the purchaser's connection with the title and its actual notice of the agreement before confirmation of the bankruptcy sale, a time at which, upon the ground of surprise, it could have receded from its attitude as purchaser, amounted to notice, or was sufficient at least to put it upon inquiry as to the state of the title and of the grantor's agreement for security. I see no reason for disturbing that conclusion. Coal Company v. Doran, 142 U. S. 417, 427–442, 12 Sup. Ct. 239, 35 L. Ed. 1063; Luke v. Smith, 13 Ariz. 155, 108 Pac. 494; Luke v. Smith, 227 U. S. 379, 33 Sup. Ct. 356, 57 L. Ed. 558.

I pass by discussion in respect to the operativeness of agreements not in deeds and not recorded, as well as the point of the appellant's that the agreement securing the purchase price was purposely and wrongfully withheld from the record, as immaterial, because my position is grounded upon the idea that the purchaser is chargeable with notice of the security and of the burden on the land.

The purchaser at the bankrupt sale took the title of the trustee in bankruptcy, which was that of the bankrupt, and no more. Company v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; Murphey v. Brown, 12 Ariz. 268, 100 Pac. 801; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986.

I do not perceive any equitable considerations which, against the obvious purposes of the parties, can operate, not only to defeat the plain terms of their agreement, but to cause the grantor to lose the price of his land. Paying to the grantor, under an agreement, not 25 per cent. as an arbitrary and fixed rate, but 25 per cent. from the net profit of operations upon land for which the grantor has not been paid, is neither an oppression nor an inequitable burden upon successors or purchasers with notice.