MUNRO v. SMITH et al.

(District Court, D. Rhode Island. July 13, 1917.)

No. 67.

1. TRUSTS ⟨=⟩371(1)—CONSTRUCTIVE TRUST—BILL.
    A bill by the trustee in bankruptcy of a mining company, which alleged that defendants acquired title to mining property for the purchase of which the mining company held a contract, that by their fraud and conspiracy defendants prevented the company from carrying out its contract, and prayed an accounting of secret profits, etc., and that defendants be required to hold the property in trust for the trustee, but made no offer to reimburse defendants for the amounts they expended in acquiring the property, and did not allege any demand on defendants for a conveyance, cannot be treated solely as a bill for the establishment of a constructive trust.

2. MINES AND MINERALS ⟨=⟩54(2)—MINING PROPERTY—VALUE.
    Where a mining claim was bought under a contract providing for payment of the purchase price in installments, and giving the purchaser an option to abandon his contract, with no other effect than a forfeiture of payments already made, the price fixed in the contract is a most uncertain indication of the cash value of the property, for payments were optional, and might be contingent upon success.

3. CORPORATIONS ⟨=⟩183—SECRET PROFITS.
    A mining company entered into a contract to purchase a mining claim, payments to be made in installments; the company, which was allowed to go into possession, being given the option to abandon the contract on forfeiture of payments already made. It being difficult to consummate the purchase, as the claim had not proven productive, stockholders of the company, who had made considerable advances, bought in the title of such claims, concealing the fact of their purchase from the company. Payments were continued, but before they had amounted to a sum equal to the price paid by such stockholders, the company defaulted. Held, that the company was not injured by the stockholders' secrecy, their reason for keeping their purchase a secret being to prevent requests for extensions, and hence there could be no recovery against the stockholders on account of alleged secret profits.

4. TRUSTS ⟨=⟩102(1)—CONSTRUCTIVE TRUSTS—CREATION.
    In such case, where the stockholders, being anxious to make a profit and to save the amounts they had advanced to the corporation did nothing to prevent it from consummating its agreement, no constructive trust

can be established on the ground that the interests they purchased were hostile to the interest of the company, where such stockholders offered to continue to make advances to the company on condition that other stockholders made similar advances, and the corporation, which was represented by its fiscal agent and other officers, indicated no intention of acquiring title to the claims in the same manner as the stockholders.

5. TRUSTS ☞102(1)—CONSTRUCTIVE TRUSTS—FIDUCIARY RELATION.
    While breach of a fiduciary relation raises a constructive trust, the existence of a fiduciary relation is a condition precedent to the raising of such trust; hence the fact that stockholders and officers of a corporation, after it had contracted to purchase mining claims, payments to be made in installments, acquired title from the vendors, will raise no constructive trust, on the theory of a breach of fiduciary relations.

6. EQUITY ☞388—BILLS—FRAUD.
    Where a bill of the trustee of a bankrupt mining company, charging actual fraud on the part of defendants, alleged a conspiracy to wreck the company, etc., such bill must be dismissed, where the fraud was not established; the general rule being that, where fraud is charged and is denied, the party making the charge will be confined to that issue.

7. CONSPIRACY ☞19—EVIDENCE—SUFFICIENCY.
    In a suit against stockholders and officers of a mining company, based on the theory that they had conspired to wreck the company and prevent it from consummating a contract to purchase mining claims, payments on which were to be made in installments, evidence *held* insufficient to establish in any way plaintiff's contentions.

8. CONSPIRACY ☞1—WHAT CONSTITUTES.
    That stockholders and officers of a mining company, who had acquired title to mines which the company was attempting to purchase under a contract providing for payment on installments, entered into a reorganization plan with creditors at a time when the company was about to become bankrupt, does not establish conspiracy to ruin the company.

In Equity. Bill by Arthur E. Munro, trustee, against Fred L. Smith and others. Decree for defendants.

Comstock & Canning and Harry M. Holbrook, all of Providence, R. I., for plaintiff.

Richard E. Lyman, of Providence, R. I., for defendants.

BROWN, District Judge. This is a bill in equity, brought by the trustee in bankruptcy of the Big Chief Mining Company, a corporation of the state of Arizona, with its principal office at Providence, R. I., adjudicated bankrupt August 24, 1915, in this court. The defendants are Fred L. Smith, formerly a director, and Charles J. Davol, citizens of Rhode Island, and Frederick E. Browne, formerly resident manager, mining engineer, and statutory agent of the bankrupt, a citizen of California. Mary H. Carroll, executrix under the will of the late Thomas A. Carroll, Esq., was originally, but is not now, a party.

The bill charges the defendants with a conspiracy to defraud and cheat the Big Chief Mining Company of its assets, to render it insolvent, to get for themselves all its property, and that certain acts in pursuance of this conspiracy were done by the defendants, with the effect of causing the mining company to become bankrupt.

The bill prays that the defendants be decreed to hold in trust for the plaintiff certain claims or rights to mining property in Hart, San Bernardino county, Cal., for a conveyance thereof to the plaintiff, for an

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

accounting and payment of damages and expenses suffered through the alleged wrongful acts of the defendants, for an accounting and payment of secret profits, for an injunction against transfers of property, and the prosecution of certain suits to quiet title, and from further prosecution of certain claims against the bankrupt corporation.

The bill makes reiterated charges of actual fraud, and makes no offer of reimbursement to the defendants of amounts paid by them for the property, which plaintiff prays may be conveyed to him; nor does the bill allege, nor do the proofs show, that at any time before the filing of the bill the company or its trustee in bankruptcy made any demand upon the defendants for a conveyance of the property, or made any offer to reimburse the defendants for their expenditures in acquiring it, although the bill shows that Smith and Davol made considerable payments for the property.

[1] It is impossible to treat the bill merely as one for the establishment of a constructive trust, and to secure for the plaintiff profits actually made by the defendants through breach of fiduciary relations. The burden rests upon the plaintiff to establish its charges of actual fraud.

The Big Chief Mining Company had not acquired full title to its mines or mining claims, but had succeeded to the rights of purchase conferred by a certain contract of May 14, 1910, between the owners of the mining claims (who may be called the Fosters and McCluskeys), and the California Big Chief Mining Company, a California corporation. The bankrupt had acquired rights to purchase the so-called "Jumbo" group of claims at Hart, San Bernardino county, Cal., for the sum of $50,000, payable out of the net returns of mining, in monthly installments, but with the guaranty of certain minimum monthly payments, which varied in amount, but from January, 1911, were required to be at least $450 per month. The contract provided for a forfeiture on nonpayment of a monthly installment after 30 days' written notice. The company, however, was under no obligation to pay the full amount of $50,000.

The Fosters and McCluskeys, owners of the mining claims, were in no sense creditors of the company, for the contract expressly provided:

"The second party shall have the right to abandon this contract at any time, with no other or further effect than a forfeiture of payments made prior to such abandonment, and nothing herein contained shall obligate the second party to purchase the mining claims and property herein agreed by the first parties to be sold."

[2] Under an agreement of this character the full amount to be paid ($50,000), in order to acquire a full title, is a most uncertain indication of the actual cash value of the property. As payments are optional, and may be contingent upon success, the vendor asks more, and the vendee is willing to pay more, than in an outright purchase for cash. Consolidated Arizona Smelting Co. v. Hinchman, 212 Fed. 813, 816, 129 C. C. A. 267.

[3] The first ground of complaint is the purchase by the defendants Smith and Davol of the rights of the Fosters and McCluskeys in the mining claims. The bill alleges that the interests purchased by the defendants Smith and Davol were of the value of the difference between

the amounts already paid by the company on account of the contract and the sum of $50,000; but, as has been said, the amount remaining to be paid in order to acquire full rights is not a proper measure of the actual value of the interest purchased by the defendants Smith and Davol.

In January, 1914, defendant Smith purchased of the Fosters a two-thirds interest in the mining claims for the sum of $5,500. At that time the sum of $17,400 had already been paid by the company, leaving $32,600 still optionally payable by the company at the rate of $450 per month. In September, 1914, the defendant Davol purchased from the McCluskeys the remaining one-third interest, paying therefor $4,700. At this time $21,000 had been paid by the company, leaving $29,000 optionally payable at the rate of $450 per month in order to perfect the company's title. At the time of these purchases the company was earning nothing from its mining operations, which, for lack of funds, had been shut down for some time, but made its payments out of moneys borrowed or contributed by stockholders. The company was considerably in arrears to the defendant Browne for salary and for expenditures made by him, and was in great financial difficulty. Though its mining engineer, Browne, had confidence in its ultimate success, the company was still in the prospective stage. In a report to the company by A. L. Flagg, a mining engineer, dated as late as February 20, 1915, and read to stockholders at a meeting on March 11, 1915, it appears:

That "the Big Chief Mining property is still in a prospective stage," that sufficient work had been done "to indicate very clearly that it is not a poor man's camp, but, on the contrary, one in which moderately large expenditures must be made to prove the ground."

The assignment by the Fosters and McCluskeys to the defendants Smith and Davol did not change the rights of the company, nor impose upon it any new obligations, but merely put the defendants Smith and Davol in the shoes of the Fosters and McCluskeys. The Fosters apparently were willing to dispose of an interest having a nominal value of $21,000, more or less, for the sum of $5,500 in cash, or a little more than one-quarter of the nominal value, and the McCluskeys to dispose of a one-third interest, having the nominal value of more than $10,000, for the sum of $4,700. The effect was to transfer the outstanding title from strangers to persons who were interested in the company as stockholders and one as a director.

About the time of Smith's purchase from the Fosters, Thomas A. Carroll, Esq., an attorney at law, paid Smith the sum of $1,500, and acquired [15/55] of Smith's interest. The plaintiff lays great stress upon the fact that the purchases by Smith and Davol were not made directly in their own names, but were made in the names of third parties, and were not disclosed by the defendants, nor known to the officers of the company, until February, 1915. The directors and stockholders were duly informed at a meeting in March, 1915. Payments by the company were continued, covering the period to January 1, 1915.

The discovery of the purchase by Smith and Davol, and of the fact that they had kept their purchase secret, was doubtless a cause of dis-

sension and of dissatisfaction on the part of the company's fiscal agent and others, who were endeavoring to promote the company and to secure funds by borrowing, and giving the lenders blocks of stock as a bonus for lending. It was doubtless, also, a disappointment to find that the defendants Smith and Davol, who had already made considerable advances of money to the corporation upon its notes, were disinclined to make further contributions, except on condition that other stockholders would also contribute to a considerable amount.

Complaint is made that, if the defendants Smith and Davol had not purchased the Foster and McCluskey claims, they would have been willing to have advanced the company more money, and that their purchase of the Foster and McCluskey rights removed from them any further inducement to advance more money. Apparently this situation gave rise to a considerable feeling of hostility to the defendants, which has so colored the view of the situation as to obscure a fair and unprejudiced view of their acts.

The secrecy which is so emphasized as a badge of fraud is satisfactorily explained by Mr. Smith: That he felt that, if he took title in his own name, the company would possibly be backward in the payments and want extensions, etc., and he testified that he did not want the company coming around to ask him to let up, and that he wanted the matter carried along as to payments, and to make a profit; that he expected that the company would complete the payments, and that after he had got his payments out he would make a profit of the difference between what he paid and what would be paid by the company on the contract.

Mr. Smith made no pretense that he was acting solely in the interests of the company in making the purchase. He did so in the expectation of profit from payments to be made by the company under its contract. This expectation, however, has not been realized up to the present time. The company has made payments to the amount of $3,300 since Smith's acquisition of title, which was divided between Smith and Carroll. Davol has received the sum of $450.

It thus appears that the defendant Smith, instead of so far making a profit from the monthly payments, has expended at least $2,200 more than he has received, and that the defendant Davol has expended at least $4,250 more than he has received. There is, therefore, no basis in the facts to warrant a decree for an accounting of so-called secret profits from payments made by the company. Upon any theory of the case it seems clear that, until the company had paid monthly installments to at least the amount of the sums paid by Smith and Davol, it had suffered no damage, and no deprivation of any legal or equitable right.

The company finally defaulted in its payments, before it had paid as much as would compensate Smith and Davol for their outlay, and thus incurred a forfeiture of its right under the original contract.

It seems to be a matter of indifference whether the Smith and Davol purchases were known to the company or not. Until Smith and Davol got their money back, they were entitled to protect themselves by secrecy, and to permit the payments to be made in regular course to the bank, which held the deeds in escrow. Until this time there could

arise no equity in the company to have the benefit of any contract which Smith and Davol had made, assuming that their contract was better than that originally made by the company, and assuming, also, that it was inequitable for them to buy on better terms than the company had assented to.

[4] The plaintiff characterizes the interest purchased as a hostile interest, but it was no more hostile in the hands of the defendants than in the hands of the Fosters and McCluskeys, so long as they sought only payment of the contract price. In acquiring these claims the defendants dealt entirely with a third party, and there is no evidence that the corporation had intrusted any of them with a duty of attempting to acquire the property by outright purchase, or to better a bargain already made. It is expressly stated in the testimony of John M. Welch, the fiscal agent and a director, that the company had never considered the matter of purchasing the Foster and McCluskey claims in this way.

The plaintiff does not in his argument exactly define any duty to the corporation which was violated by these defendants, except the supposed duty of giving to the company an opportunity to purchase the Foster and McCluskey interests, instead of taking them for themselves. There is no evidence in the case which is sufficient to show that the company has in fact lost a valuable opportunity to acquire the property on terms better than those of its contract with the Fosters and McCluskeys. The company was fully represented by other officers and by a fiscal agent. Its contract, with the right of abandonment at will without incurring further liability, had certain advantages, and it was apparent that it would still be necessary for the company to raise considerable sums to develop its mines. Whether the plaintiff would have had a right to any advantages resulting from the acquisition by the defendant of these properties seems, however, a moot question in this case. The mining company had lost all its rights under the contract before the defendants had made themselves good. Unless this forfeiture is in some way attributable to acts of the defendants— if it resulted solely from the inability of the company to raise funds, and if there was no interference by these defendants with the raising of funds—it would seem a matter of indifference whether this forfeiture inured to the benefit of the Fosters and McCluskeys, or to the benefit (if it be a benefit) of the defendants. In either event the vendees retain nothing which ever belonged to the company, except what it had contracted to forfeit in case of nonpayment. The defendants are still left with a mining property, so far unproductive, with its operations shut down, and requiring reasonably large advances for its development—a mining venture still uncertain of success.

It must be remembered that the purchase of mining claims is the purchase of an opportunity to engage in a business equivalent in its results to a manufacturing process, and requiring capital and labor for its development. See Stratton's Independence v. Howbert, 231 U. S. 399, 413, 415, 34 Sup. Ct. 136, 58 L. Ed. 285. It is often more difficult to finance a mining venture than to acquire the mines.

There is in this case no definite evidence as to the value of the claims purchased by the defendants, and it has not been made to appear that

they are worth as much as the defendants Smith and Davol paid for them, or that the company ever was able or desired to buy them at that price.

Upon the evidence I find that the plaintiff has not sustained his allegations that the defendants conspired to wreck the company by preventing it from making its payments. I find as a fact that the bankruptcy of the company was not brought about by any act of the defendants, but was due to the inability of the company to raise the necessary funds to meet its payments and its assessments and expenses of operation; that, even had the defendants refused altogether to put in any more money, this would not have amounted to a legal wrong; but I find that they did contribute certain sums, and were willing to contribute further upon conditions that were not unreasonable.

[5] While the courts maintain with strictness the doctrine that a breach of a fiduciary relation raises a constructive trust, this doctrine requires as its foundation proof of a fiduciary relation. As was said by the Circuit Court of Appeals for the Eighth Circuit, in Steinbeck v. Bon Homme Mining Co., 152 Fed. 333, 338, 81 C. C. A. 441, 446:

"But, like every rule and principle of the law, it is founded in a controlling reason which is its life, and, where the reason ceases, the rule is impotent. The reason is that no one may profit by a betrayal of the confidence of his correlate, and by the use, to the latter's detriment, of knowledge or interest acquired by means of the fiduciary relation. The test of the existence of a constructive trust of this nature is the fiduciary relation, and the betrayal of the confidence reposed under it to acquire the property of interest of the correlate, and, in the absence of either of these indispensable elements, no such trust can arise. Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 648, 61 L. R. A. 176."

In Trice v. Comstock, 121 Fed. 620, 623, 57 C. C. A. 646, 649, 61 L. R. A. 176, the rule is stated broadly:

"From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his cestui que trust, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created."

In the present case there is no evidence that these defendants used their positions or their knowledge to prevent the company from accomplishing its purpose of acquiring the property in accordance with its plans. They took nothing which belonged to the company, and imposed upon it no new burden in accomplishing its purpose.

[6] The plaintiff has cited no case which goes so far as to hold that a purchase of this character, which involves only a substitution of officers or directors or stockholders of a company in the rights of a third party who had previously made a contract with the company, can be regarded as a sufficient basis for the establishment of a constructive trust. In the absence of evidence that a profit has been made, or that they have secured something which is worth to the company more than they paid for it, there seems to be no room for the application of the equitable doctrine as to constructive trusts. But the plain-

tiff cannot avoid the fact that the bill framed by him is a bill which charges a fraudulent conspiracy to wreck the company. This conspiracy could not be completed merely by the purchase of the Foster and McCluskey interests, but could only be effected by preventing the company from making its payments through some unlawful interference leading to forfeiture.

In Hendryx v. Perkins, 114 Fed. 801, 806, 52 C. C. A. 435, 440, it was said:

"A party who charges fraud assumes a grave responsibility by reason of making injurious allegations, which he cannot escape by substituting another issue in lieu thereof. The only exceptions have been in some instances where the bill had a double aspect, so that, therefore, it might be sustained according to its other allegations, even if those charging fraud were not proven. In such cases the proper practice is to expressly dismiss the bill so far as fraud is concerned."

The general rule that, where fraud is charged in a bill and is denied, the party making the charge will be confined to that issue, is cited in Wall and Foss v. Parrot Silver & Copper Co. et al., 37 Sup. Ct. 609, decided by the Supreme Court of the United States June 4, 1917.

[7, 8] The charges of fraud require that we consider more in detail the question whether the defendants did fraudulent acts to prevent the company from making its payments.

The purchase of the claims by these defendants, and the nondisclosure, had, of course, no such effect. On the contrary, the nondisclosure indicates very clearly the desire of the defendants that the company should continue its payments as before. The scheme of securing secret profits by collecting the monthly payments required their continuance for more than 22 months before reimbursement of defendants' expenditures, and for a considerable time thereafter in order to make a profit. This was not consistent with a plan of an early wrecking of the company, or of disabling it from making payments.

Though the bill, in paragraph 22, alleges a conspiracy to prevent the company from raising money for its monthly payments, it is so vague and uncertain in its allegations as to afford no proper basis for proof. It states that defendants knew that monthly installments were being paid out of a $12,500 subscription, and that they knew that the fiscal agent, John M. Welch, "could not comply with conditions laid down by themselves in reference to the aforesaid subscription." This is so feeble a presentation of charges of actual fraud that it might well be wholly disregarded, but for its apparently unjust reflection upon the good faith of Thomas A. Carroll, Esq. Certainly his objection, at a meeting September 21, 1914, to a plan of borrowing $15,000 from strangers, which would afford a commission of $2,250 to the company's fiscal agent, might be taken as evidence of sound judgment, rather than of a fraudulent purpose.

The plaintiff's contention that there was improper interference with the efforts of the company to borrow more money, and that this was the cause of the failure of the company to make its payments, I find not to be sustained by the proofs, which are quite as vague and indefinite as the allegations of the bill.

I find, also, that there was no intention of any of the defendants to do any act to prevent the company from raising other moneys necessary to pay assessments or outstanding bills, but that, on the contrary, the defendants were willing to contribute, and did contribute, for this purpose.

It is also charged that the defendant Browne "was intentionally permitting his claim for unpaid salary to increase from time to time"; that he gathered in certain claims to add to his own, for the purpose of attaching the personal property of the company, as further steps in the conspiracy. This perversion of the company's failure to pay Browne's salary, and a few bills that he had contracted for the company's benefit with his own guaranty of payment, into "steps in a conspiracy," is a most extraordinary and unjustifiable attempt to convert the company's own fault into a part of a supposed scheme of the defendants. The constant efforts of Browne to secure payments from the company, and to induce the company to raise money for this purpose, are a complete answer to this remarkable charge.

It is further charged that Thomas A. Carroll, Esq., while director and attorney for the company, after suit brought by Browne, did advise the California attorneys of the company that the company had no defense to Browne's suit, by reason of which the company allowed judgment to be taken by default, and "did not inform the company of facts within his own knowledge which could be set up in an answer to the Browne complaint and which the complainant avers would be a good and sufficient defense."

So far as appears, there is no basis for this charge of bad faith. The debts upon which Browne brought suit were just debts long overdue, and no grounds of defense are alleged or proved. It certainly was not Mr. Carroll's duty to advise the company that by reason of some far-fetched theory Browne was a party to a fraudulent conspiracy, and his just claims might be defeated for that reason.

If the vague allegations of paragraph 29 of the bill mean or imply anything more than this, such further meaning does not appear. There is no ground for holding this to be a fraudulent act, or other than sound advice. There is no doubt that the defendant Browne was fully justified in bringing suit against the company and attaching its personal property, and that this was entirely consistent with good faith.

It is further argued that the purchase of the interests made Browne, Smith, Carroll, and Davol all hostile to the company, and deprived the company of their services. But the primary interest of Browne was to get payment for his past and present services, and of Smith, Carroll, and Davol to receive the monthly payments from the company. The money required for the monthly payments did not go to Browne, whose interests thus differed from those of the others. So long as the company, by borrowing or by its operations, might be able to take care of its payments, there seems to have been no reason for desiring to harass it or prevent it from continuing.

It seems to be true, however, that in making the purchase it was the intention of Smith and Davol to put themselves in a position which would enable them to carry on the enterprise under a reorganization,

in case of the failure of the company under its then management. There is in the written correspondence much evidence of the intention of the defendants to co-operate in the reorganization of the enterprise.

When failure was imminent, there seems to have been an understanding between the parties that such rights as should be secured by Browne under his attachments and judgments, and such rights as should be secured by Smith and Davol by the exercise of rights of forfeiture and by suit upon notes of the company held by them, should be used by them in reorganizing or in forming a new company. It was a plan for salvage out of an impending wreck, due to the failure of the fiscal agent and other officers to finance the company, rather than a plan to cause the wreck.

In the plans for reorganization the plaintiff finds his principal evidence of a conspiracy or a meeting of the minds of the defendants.

But this is all too late to support the charges of the bill; it is action in extremis, and not the cause of the bankruptcy, which was the result of the failure of long-continued efforts to finance a doubtful mining enterprise, which, under different acts of incorporation and under various names, had not made a profit.

The responsibility for this failure cannot be shifted to the shoulders of these defendants by far-fetched and unjustifiable charges of a fraudulent scheme to wreck the company.

The scheme of fraud set up in this bill was not of the defendants' invention, and the defendants' acts do not fit such a scheme, but are inconsistent with it.

The plaintiff argues at length that, even if the charges of actual fraud are not sustained, a case of constructive fraud is yet made out.

As we have said, there is no ground for a decree for an account of secret profits, for it is proved that there were none. Assuming, for argument, what is not established, that the plan to make profits by receiving monthly rentals was a breach of fiduciary relations, this is now of no consequence, since it was defeated by the company's inability to raise money, and not, as we find, by any acts of the defendants which prevented it from doing so. This plan for "secret profits" from monthly payments disappears from the case, whether its failure was due solely to the inability of the company to pay, or was due to its abandonment by the defendants before any profit was made, upon the alleged adoption of an alternative plan of preventing the company from making the payments. In either aspect, whether defeated or voluntarily abandoned, it was not carried out, and did not result in the payment by the company of more than it must have paid in any event.

There remains in the case only the alleged fraudulent plan of acquiring the full ownership of the mining claims and of disabling the company from completing the purchase, thereby forfeiting its contract rights.

This plan comprehends two essential and inseparable parts, and the supposed illegality of acquiring the claims depends upon the intent to carry out the plan of disabling the company from buying under the contract of May 10, 1914.

Finding as a fact that there was no intent to disable or prevent the company from exercising its rights to purchase, and that this was not done by the defendants, there remains no ground charged in the bill for finding that the purchase of the mining claims by the defendants Smith and Davol was unlawful or inequitable, or in violation of any rights of the company. While acts lawful in themselves may become unlawful as parts of a general scheme, if the general scheme is disproved and the connection is thus broken, a plaintiff cannot be permitted to set up a new and distinct ground for equitable relief that is not pursuant to his bill. He who unjustifiably charges actual fraud done in pursuance of a conspiracy cannot expect the aid of a court of equity in constructing out of the remnants of his case some other case, based upon some different principle of equity not invoked in his bill. United States v. Reading Co., 226 U. S. 324, 372, 373, 33 Sup. Ct. 90, 57 L. Ed. 243. A charge of fraud calls upon a defendant to protect his character, and when there is a failure of proof, or when he has disproved the charge, he is entitled to a full dismissal. Cases in which general charges of fraudulent conspiracy are made, in order to give the color of fraud to many acts innocent in themselves and consistent with legal rights and with an honest intention, require the strict application of the rule when the charges of fraud fail.

These defendants testified before me at length under direct and cross examination. I am satisfied that they, and Thomas A. Carroll, Esq., are unjustly charged with a conspiracy to wreck this company, or to defraud it or their associates. I am of the opinion that they were willing to do their share towards contributing funds to carry on the enterprise, though they were unwilling to assume the burden of carrying the enterprise for the benefit of others who would not contribute.

The plaintiff, in my opinion, has failed to establish any right, based either upon fraud or upon breach of fiduciary relations, to a decree establishing a trust or requiring a conveyance from the defendants Smith and Davol; and there is no just ground for an injunction against any of the defendants, or for granting any relief prayed for in the bill.

The bill will be dismissed.